**Donna Conlin OLAM, Plaintiff,**

v.

**CONGRESS MORTGAGE COMPANY, et al., Defendants.**

**No. C95–2806 WDB.**

United States District Court,
N.D. California.

Oct. 15, 1999.

Carol Johnson Lundberg, San Francisco, CA, Phyllis Rafler, Oakland, CA, Terrence P. Murphey, Jacqueline C. Hamilton, Castleman Law Firm, Pleasanton, CA, for Plaintiff.

Daniel E. Stea, Law Office of David R. Medlin, Oakland, CA, for Defendants Equity Holders Servicing Co., Robert S. Gaddis.

David R. Medlin, Medlin & Stea, Oakland, CA, for Defendants Congress Mortg. Co., Benjamin C. Albritton, Esmond C. Lyons, Esmond C. Transcorp, Richard Lincoln Trust Co. Richard Franz, Robert G. Aptekar, Ke Ling Lee, John Hartmann, William N. Mozena, Patricia Mozena.

## AMENDED ORDER AND OPINION RE DEFENDANTS' MOTION TO ENFORCE SETTLEMENT

BRAZIL, United States Magistrate Judge.

### INTRODUCTION—MAJOR ISSUES PRESENTED

The court addresses in this opinion several difficult issues about the relationship between a court-sponsored voluntary mediation and subsequent proceedings whose purpose is to determine whether the parties entered an enforceable agreement at the close of the mediation session.

As we explain below, the parties participated in a lengthy mediation that was hosted by this court's ADR Program Counsel—an employee of the court who is both a lawyer and an ADR professional. At the end of the mediation (after midnight), the parties signed a "Memorandum of Understanding" (MOU) that states that it is "intended as a binding document itself...." Contending that the consent she apparently gave was not legally valid, plaintiff has taken the position that the MOU is not enforceable. She has not complied with its terms. Defendants have filed a motion to enforce the MOU as a binding contract.

One of the principal issues with which the court wrestles, below, is whether evidence about what occurred during the mediation proceedings, including testimony from the mediator, may be used to help resolve this dispute. Before we address the merits of these issues, we must decide whose law to apply (state or federal).

Because the pertinent background facts and the procedural setting are of some moment, we discuss them with some care in the first section. Then we turn to choice of law issues. After deciding whose law governs, we address some challenging procedural and substantive questions. Thereafter, we consider the record developed at the evidentiary hearing—to determine what the factual setting is in which we apply the law. With the factual setting defined, we are positioned to explain why we have decided to grant the defendants' motion and to enforce the settlement agreement.

### THE PERTINENT FACTUAL AND PROCEDURAL BACKGROUND

The events in the real world out of which the current dispute arises began unfolding in 1992, when Ms. Olam applied for and received a loan from Congress Mortgage in the amount of $187,000. The 1992 loan is secured by two single-family homes located in San Francisco and owned by Ms. Olam. These properties are referred to as the "Athens Property" and the "Naples Property" because they are located on Athens Street and Naples Street, respectively.

Plaintiff states that she never read the 1992 loan documentation and that she simply signed where Congress Mortgage's agent told her to sign. *See*, Declaration of Donna Conlin Olam in Support of Her Memorandum Opposing Defendants' Motion to Compel Contract Arbitration, filed September 1, 1995.

Ms. Olam contends that she could not afford the monthly payments on the 1992 loan. Eventually she defaulted. Thereafter, Congress Mortgage initiated foreclosure proceedings on both the Athens and Naples Properties.

#### The purported May 1993 work-out agreement

Defendants allege that on May 21, 1993, plaintiff entered a work-out agreement pursuant to which, among other things, money earmarked for renovating the property was applied to the defaulted loan—in order to bring plaintiff's payments up to date. *See*, Exhibit D–1, admitted at Au-

gust 23, 1999 evidentiary hearing.[1] Defendants further contend that, at the time she signed the May 1993 agreement, plaintiff was represented by an attorney, Carl Windell, who reviewed both the work-out agreement and the original 1992 loan documentation. Both plaintiff and Mr. Windell's signatures appear on the 1993 agreement. *See,* Ex. D–1

Plaintiff, in sharp contrast, asserts that Mr. Windell was not her attorney at that time. Instead, she says, Mr. Windell was "hired" by Robert Gaddis of Congress Mortgage to resolve a problem with a contractor and to review the original loan documentation. Plaintiff contends that Mr. Windell did not explain the 1993 workout agreement to her and that she did not understand it at the time she signed. *See,* August 28, 1998 Deposition of Donna Conlin Olam, filed August 23, 1999 at 395–410 (hereafter "Olam Depo."). Ms. Olam also alleges that she was under "extreme duress" at the time she signed the 1993 agreement and that she was coerced into signing it. *See,* Olam Depo., at 395–410; Transcript August 23, 1999 Evidentiary Hearing, WDB Tapes No. 1–3 (hereafter "E.H. Transcript").

Plaintiff again defaulted on her loan payments. In late 1993, Congress Mortgage notified plaintiff that it would again begin foreclosure proceedings on the properties.

***The purported October 1994 "extension" agreement***

According to defendants, the second foreclosure notice led to more negotiations between Ms. Olam and Congress Mortgage, negotiations that by October of 1994 had produced yet another written agreement. *See,* Exhibit D–2. Under its terms, Congress Mortgage would sell the Athens Street property, reduce the outstanding principal on the 1992 loan by the sale amount, and restructure Ms. Olam's remaining debt so that her monthly payments would be smaller. Defendants con-

tend that in entering this agreement Ms. Olam was represented by attorney Paul H. Melbostad. Both Mr. Melbostad and Ms. Olam signed the October 1994 agreement. *See,* Ex. D–2.

Ms. Olam, however, contends that the October 1994 agreement—like the 1992 original loan documentation and the 1993 workout agreement—cannot be enforced because, among other things, she did not freely consent to it. She claims that at the time she signed the October 1994 agreement she was under economic duress, imposed by the impending foreclosures. *See,* Olam Depo., at 413–430. Ms. Olam also asserts that she did not read the October 1994 agreement, that Mr. Melbostad did not explain the agreement to her, and that she signed it only because he told her to do so.[2] *See,* Olam Depo., at 413–430; E.H. Transcript. At one point plaintiff contended that, due to incapacitating medical conditions, she was incapable of understanding the nature, purpose, and effect of the 1994 agreement. *See,* Plaintiff's Memorandum of Law Regarding Regulation Z; Plaintiff's Statement Re: Mediation, . . . , filed August 24, 1998. However, at her deposition, defense counsel asked plaintiff whether her medical incapacity contributed to the alleged duress she was experiencing at the time she signed the 1994 document—and plaintiff responded that it did not. .*See,* Olam Depo., at 433:1–4.

It appears that defendants gave notice of a proposed sale of the Athens property in November 1994, but that an injunction prevented the sale process from going forward. That injunction was issued by a state court in which people (the Manns) who were trying to buy the Athens property from Ms. Olam had sued Ms. Olam and Congress Mortgage.

***This lawsuit begins***

On June 23, 1995, Donna Conlin Olam filed in state court the instant lawsuit

---

1. Unless otherwise stated, all references to "Exhibits" refer to those admitted at the August 23, 1999 evidentiary hearing.

2. Ms. Olam has sued or intends to sue Mr. Melbostad for malpractice. *See,* Olam Depo., at 421.

against Congress Mortgage, its president Robert Gaddis, and Equity Holders Servicing Company. The pleading on which the case eventually proceeded contained state and federal claims, including a claim under the federal Truth in Lending Act ("TILA") and claims for fraud and breach of fiduciary duty. At the time she filed the original complaint Ms. Olam was represented by attorney Carol Johnson Lundberg. On August 3, 1995, defendants removed the case to this court, where it was assigned to District Court Judge Stanley A. Weigel.[3] *See,* Order re Court Procedures, filed August, 4, 1995. On August 17, 1995, plaintiff demanded a jury trial.

Prior to plaintiff's jury demand, Congress Mortgage had moved the District Court to compel Ms. Olam to submit her dispute with Congress Mortgage to arbitration pursuant to terms set forth in the 1992 loan agreement. Plaintiff opposed that motion arguing, among other things, that the agreement to arbitrate was procured by fraud. *See,* Plaintiff's Memorandum in Opposition to Defendants' Motion to Compel Contract Arbitration, filed September, 1, 1995. She contended that she had not read the loan documents when she signed them in 1992 (at least in part because she did not have her reading glasses) and that Congress Mortgage had not told her about the arbitration clause. *See,* Declaration of Donna Conlin Olam in Support of Her Memorandum Opposing Defendants' Motion to Compel Contract Arbitration, filed September 1, 1995. Based on Ms. Olam's factual contentions, Judge Weigel denied the motion to compel arbitration. *See,* Order, filed November 6, 1995.[4]

3. Plaintiff filed a Motion to Remand on September 1, 1995. Judge Weigel denied plaintiff's motion in an Order filed November 6, 1995.

4. On April 17, 1998, defendants filed a Motion to Enforce Plaintiff's Waiver of Jury Trial. Defendants cited a clause in the October 1994 agreement which purported to ratify the agreement to arbitrate found in the original loan documents and which acknowledged

### Plaintiff and her former counsel reviewed and discussed ADR options

In November 1995, plaintiff and her then-counsel, Carol Lundberg, certified that they had reviewed and discussed available court and private dispute resolution options. *See,* Certification of Discussion of ADR Options, filed November 16, 1995.

### The case is reassigned and plaintiff changes counsel

On June 16, 1997, this case was randomly reassigned to District Judge Vaughn R. Walker. Sometime shortly thereafter, Phyllis Voisenat (then Phyllis Rafter) replaced Carol Lundberg as Ms. Olam's lawyer in this litigation. *See,* Civil Minute Order, filed August 1, 1997.

At an August 1, 1997, case management conference the parties consented to disposition by a magistrate judge. On August 11, 1997, this case was reassigned to me for all further proceedings.

### Attempts to conduct settlement discussions fail

On December 5, 1997, at a status conference, the court asked plaintiff's counsel to discuss the possibility of mediation with her client. The court instructed Ms. Rafter that she was not to pressure the plaintiff to participate and that she was to inform plaintiff that she would not give up her right to go to trial by participating in mediation. Plaintiff subsequently agreed to participate in court-sponsored mediation.[5] *See,* Notice of Plaintiff's Consent to Mediation, filed December 10, 1997.

With input from the parties, the mediation was scheduled for March of 1998—but the day before it was to commence counsel for plaintiff canceled the session—citing

that plaintiff was waiving her right to a trial by jury. Defendants motion was denied based on law of the case.

5. Plaintiff's consent was, however, contingent on the court continuing the trial so that the mediation would take place after mid-February 1998. The need for this delay was allegedly due to plaintiff's "present, physical and emotional conditions."

problems communicating with her client. *See,* Transcript of Status Conference April 1, 1998, WDB Tape No. C98–025. The court expressed its disappointment that the parties had inconvenienced the assigned mediator and removed this matter from the court-sponsored mediation program. *See,* Civil Minute Order and Order, filed April 2, 1998; WDB Tape No. C98–025.

### The court sets this case for trial

In early April of 1998 the court ordered trial of this case to begin on September 15, 1998.

The parties began filing pretrial submissions on July 30, 1998.[6] Some of plaintiff's submission were untimely. That fact triggered a motion by defendants to exclude certain evidence and an order by the court prohibiting plaintiff from introducing at trial any document that defendants had not disclosed—save for purposes of impeachment. *See,* Order Following August 11, 1998 Status Conference, filed August 11, 1998.

### Shortly before trial the parties agree to try mediation

At the final pretrial conference on August 20, 1998, the court asked plaintiff's counsel whether there was any meaningful possibility that a mediation would be useful. Ms. Voisenat expressed hope in this regard. The court then encouraged the parties to consider one last try at mediation. I directed Ms. Voisenat to explain to Ms. Olam that if there was a mediation she would be expected to participate in good faith—but that "good faith participation" does not mean that Ms. Olam would have to "cave in" or agree to anything. I also asked counsel to make sure that Ms. Olam understood that if the mediation was unsuccessful the trial would proceed as scheduled.

Shortly thereafter, Ms. Olam, through her counsel, notified the court that she

"consents to mediation in this case and agrees to participate in good faith, so long as 1) the mediation is conducted by a properly qualified mediator, familiar with truth in lending, mortgage and disclosure laws; 2) The mediation occurs in San Francisco at a convenient location and time; 3) The Mediation is conducted confidentially, such that all statements or writings submitted in furtherance of mediation, is [sic] submitted confidentially to the mediator, and/or such statements or writings are inadmissible in trial." *See,* Plaintiff's Memorandum of Law Regarding Regulation Z; Plaintiff's Statement Re: Mediation, . . . , filed August 24, 1998.

### The parties schedule the mediation

On August 25, 1998, with the fully voluntary consent of the parties, the court referred this matter to mediation under the court-sponsored ADR program. Because so little time remained before trial was to commence it would have been virtually impossible to arrange for one of the private lawyers in the court's panel to serve as the mediator—so Howard Herman, one of the two extensively trained mediators who works on the court's staff, agreed to serve as the neutral.

The mediation was scheduled to begin on September 9, 1998, at 10:00 a.m. *See,* letter dated August 28, 1998 from Howard Herman to the parties' counsel, filed August 31, 1999. Mr. Herman asked counsel to review several matters prior to the mediation including the best and worst alternatives to a negotiated settlement and the strengths and weaknesses of the case. He also advised counsel that he would "keep the whole day available to allow the mediation to continue as long as it is being productive."

### The September 9–10, 1998 mediation[7]

At approximately 10:00 a.m. on September 9, 1998, Ms. Olam, her attorney, Ms.

---

6. *E.g.,* witness lists, proposed voir dire, etc.

7. We describe the mediation only generally here. The court will set forth the participants' testimony and will make more detailed

factual findings about what transpired at the mediation as necessary in sections III and IV, where we discuss plaintiff's claim that her apparent consent to the purported settlement agreement was not legally viable.

Voisenat, Mr. Gaddis, Russel Hulme (a representative of Congress Mortgage), and Mr. Stea (defendants' lawyer) met with Mr. Herman to commence the mediation. The mediation continued throughout the day and well into the evening.

Sometime around 10:00 p.m. Mr. Herman, Ms. Voisenat, and Mr. Stea retired to Mr. Herman's office to type up what they believed were the essential terms of a binding settlement agreement. *See,* E.H. Transcript. As previously mentioned, they called the document they drafted a "Memorandum of Understanding" (the "MOU"). It contemplated the subsequent preparation of a formal settlement contract but expressly declared that it was "intended as a binding document itself." *See,* Exhibit D–3. The essential terms of the purported settlement are clearly set forth in the typed MOU. At approximately 1:00 a.m., when the mediation concluded, Ms. Olam and her lawyer, and Messrs. Gaddis and Hulme and their lawyer, signed the MOU.

Following the conclusion of the mediation, Mr. Herman drove Ms. Voisenat and Ms. Olam to their homes.

### Post-mediation confirmation of settlement by counsel

Later on September 10, 1998, Mr. Stea informed the court that the parties had settled the case. *See,* September 10, 1998 letter from Daniel Stea to the court's deputy clerk. About noon that day the parties' counsel appeared by telephone at a status conference called by the court. Both Mr. Stea and Ms. Voisenat confirmed on the record that the parties had settled the case by agreeing to all essential settlement terms and by committing those terms to a writing they had signed.[8] Because the case had settled, counsel asked the court to vacate the impending trial. *See,* Civil Minute Order and Notice, filed

September 10, 1998; Transcript of September 10, 1998 hearing, WDB Tape NO. C98–062. The court informed the parties that the mediator, Mr. Herman, had called earlier that day to confirm that the parties had settled the case.[9]

### Plaintiff tries to communicate directly with the Court; problems surface

At approximately 1:45 p.m. on September 10, 1998, plaintiff telephoned my chambers. My staff informed her that I could not speak to her outside the presence of the other parties and counsel. She was referred to the mediator. *See,* Notice, filed September 10, 1998.

Having not received the formal settlement agreement and dismissal, the court held a status conference on December 2, 1998. Counsel informed the court that the document anticipated in the MOU had not yet been executed, but that Mr. Herman had generously offered to work with counsel to finalize the drafting and then to review the document with plaintiff to assure her that it accurately reflected the terms of the settlement reached at the mediation. *See,* Transcript of December 2, 1998 conference, WDB Tape No. C98–079. For reasons not clear to the court, these efforts failed to bear fruit. Plaintiff never signed the formal settlement contract anticipated in the MOU the parties signed on September 10, 1998.

### Defendants file a motion to enforce the settlement

On April 21, 1999, more than seven months after the mediation, defendants filed a Motion to Enforce the Original Settlement ... and to Enter Judgment Thereon (hereafter "Motion to Enforce").

On May 4, 1999, the court granted plaintiff's request to substitute Terrence P.

---

8. At some point after Ms. Olam received the 1992 loan, Congress Mortgage assigned its interest in Ms. Olam's loan to various people and entities. These assignees had not signed the Memorandum of Understanding generated at the mediation but Mr. Stea represented to the court that he had communicated with them and that he was authorized to and did

commit to the agreement on their behalf. *See,* Transcript of September 10, 1998 hearing, WDB Tape No. C98–062.

9. Mr. Herman also filed a certification in which he represented that the case had settled fully. *See,* Certification of ADR Session, filed October 5, 1998.

Murphy for Phyllis Voisenat as her attorney of record.[10]

On May 14, 1999, Ms. Olam, through her new attorney, filed her "Opposition" to the defendants' motion to enforce. Two separate grounds for the opposition were set forth. The first was that the MOU was unconscionable. We considered and rejected that contention in a separate order. Order Setting Status Conference, filed June 11, 1999. The second ground for opposition was that at the time she affixed her name to the MOU (at the end of the mediation) the plaintiff was incapable (intellectually, emotionally, and physically) of giving legally viable consent. Specifically, Ms. Olam contended that at the time she gave her apparent consent she was subjected to "undue influence" as that term is defined by California law. *See*, Plaintiff's Brief Concerning California Law Applicable to Purported Settlement Agreement, filed July 26, 1999; Plaintiff's Opposition to Motion to Enforce Settlement Agreement, filed May 14, 1999.

As we discuss in more detail *infra*, plaintiff alleges that at the time she signed the MOU she was suffering from physical pain and emotional distress that rendered her incapable of exercising her own free will. She alleges that after the mediation began during the morning of September 9, 1998, she was left *alone* in a room *all* day and into the early hours of September 10, 1998, while all the other mediation participants conversed in a nearby room. She

claims that she did not understand the mediation process. In addition, she asserts that she felt pressured to sign the MOU—and that her physical and emotional distress rendered her unduly susceptible to this pressure. As a result, she says, she signed the MOU against her will and without reading and/or understanding its terms.[11]

After receiving defendants' "Reply," we held a status conference to consider how to proceed. Persuaded by pertinent authorities [12] that the appropriate course was to hold an evidentiary hearing (to explore the factual bases for plaintiff's positions), we sought inputs from the parties about (1) whose law to apply (both to the substance of the enforcement issues and in resolving privilege questions) and (2) the extent to which it was appropriate to take testimony about what happened and what was said during the mediation.

After receiving additional papers from the parties addressing these matters, the court held another status conference on July 21, 1999. At that time counsel for plaintiff confirmed that plaintiff agreed to waive any attorney-client privilege that would attach between her and her former counsel, Phyllis Voisenat. *See*, Transcript of July 21, 1999 Status Conference, WDB Tape No. C99–061(a) and (b); Order re July 21, 1999 Status Conference and Civil Minute Order, filed July 23, 1999. Plaintiff also waived any "mediation privilege" that might attach to any and all communications made during the mediation.[13] *Id.*

---

**10.** According to Ms. Voisenat, plaintiff had terminated her during the course of a post-mediation meeting with Mr. Herman. *See,* Declaration of Phyllis Voisenat in Support of Withdrawal of Attorney of Record and Request for Order thereon, filed May 5, 1999. Ms. Olam disputes this characterization of the conclusion of their relationship. *See,* Transcript of May 25, 1999 hearing, WDB Tape No. C99–046.

**11.** The court notes that plaintiff similarly asserts that she did not read or understand the 1993 or 1994 agreement and that she signed those agreements against her best interest because she was under duress and pressured by her then-attorneys. We do not know whether these assertions are true, but we note the parallel between those two separate circum-

stances and the circumstances that currently face the court.

Nonetheless, our rulings, *infra,* about whether plaintiff was in a condition that seriously compromised her ability to understand the MOU and about whether plaintiff was pressured to sign the MOU are *unaffected* by the above-noted parallel. Absent the noteworthy parallel, our ruling would remain unchanged.

**12.** *Russell v. Puget Sound Tug & Barge Co.,* 737 F.2d 1510 (9th Cir.1984); *Callie v. Near,* 829 F.2d 888 (9th Cir.1987); *Autera v. Robinson,* 419 F.2d 1197 (D.C.Cir.1969).

**13.** At this juncture, plaintiff had not decided whether she would waive any privilege that

Defendants agreed to a limited waiver of their mediation privileges—so that testimony could be taken about both the mediator's and the defendants' interaction with plaintiff and her attorney during the mediation.

As we explain below, it is not at all clear that the waivers by the parties were sufficient to make it lawful to compel testimony from the mediator. But before we could resolve that question and others, we had to decide whose law to apply. So we turn to the choice of law issues in the next section.

## CHOICE OF LAW

When pressed to determine whose law to apply, it is important not to proceed in the abstract, but to ask: apply to what? In this case, there could be at least four different "whats"—*i.e.*, four different matters about which a choice of law must be made. The first such "what" would be plaintiff's underlying claims—two of which sound in state law, one of which sounds in federal law (TILA). A second possible "what" is defendants' claim that the mediation produced an enforceable contract. A third subject about which a choice of law must be made is whether it is appropriate, in this setting, to consider evidence about what happened during the mediation: whose law determines whether—and to what extent—communications and conduct occurring during the mediation are protected from disclosure or subsequent evidentiary use? The fourth "what" about which choice of law questions might be raised is at least in part procedural: whose law should dictate what procedures a federal district court should use when determining whether to "admit" evidence to which a privilege that is based in state law attaches?

The first of the possible "whats" just described is not before the court at this juncture—we do not address here whether plaintiff could or should prevail on her underlying claims. We are required to grapple, however, with the remaining three subjects.

■ The issue that defendants' motion presses to center stage at this juncture is whether the parties entered an enforceable contract at the close of the mediation session. That is a question of contract law [14] —and there is no general federal law of contracts. Nor do the defendants purport to rely (in this motion) on any federal law, statutory or common. Rather, the rights that defendants assert are creatures entirely of state contract law. And plaintiff does not dispute that the source of the norms under which the contract issues that are raised by defendants' motion will be resolved is state law, here the law of the state of California. So when we turn, below, to consider whether defendants have proved that the parties entered an enforceable agreement at the end of the mediation, the rule of decision will be supplied by the substantive law of the state of California.

■ Before determining whether defendants have proved their substantive state law claim, however, it was necessary to resolve important issues that would affect what evidence could be adduced and considered in the evidentiary hearing. Most critically, we had to determine whether, to what extent, and through what procedures we may consider evidence about what occurred during the mediation. To whose law were we to look when resolving these questions? Plaintiff suggested that federal law should be the source of the norms

might attach to communications between plaintiff and Mr. Herman *after* the mediation. The court did not rule on whether any privilege attached to those communications or on whether, if any privilege attached, plaintiff had waived it by asserting her defense to the Motion to Enforce. *See*, Order re July 21, 1999 Status Conference, filed July 23, 1999.

A month later, however, plaintiff expressly waived any privilege she might have held for communications with the mediator after the September 9, 1999 session. *See*, note 25, *infra*.

14. *See, e.g., Huens v. Tatum,* 52 Cal.App.4th 259, 264–65, 60 Cal.Rptr.2d 438 (3d Dist. 1997).

that guide us in considering these matters. Defendants contended that we are bound to follow the law of the state of California.

In support of her argument, plaintiff pointed out that the federal district court's subject matter jurisdiction over the underlying claims is not based on diversity of citizenship (there is no such diversity), but on the fact that one of plaintiff's three claims arises under a federal statute (TILA). Jurisdiction over the state law claims is merely pendent—it exists only because there is some factual/evidentiary overlap between those causes of action and the claim that is based on the federal statute. At least in a setting like this, the rule in the 9th Circuit appears to be that privilege [15] issues that arise during litigation of the merits of the underlying claims are to be resolved by applying federal law—generally the federal common law of privilege (except where a federal statute expressly creates a privilege or imposes a duty of confidentiality). *See,* Federal Rule of Evidence ("F.R.E.") 501; *Folb v. Mo-*

*tion Picture Industr. Pension & Health Plans,* 16 F.Supp.2d 1164 (C.D.Cal.1998) *citing Religious Technology Center v. Wollersheim,* 971 F.2d 364, n. 10 (9th Cir. 1992); *Roberts v. Heim,* 123 F.R.D. 614 (N.D.Cal.1988).

Counsel for plaintiff contended that the parties must be presumed to have understood these legal principles and, therefore, presumed to have entered the mediation process expecting federal law to serve as the source of the protection of the confidentiality of the mediation proceedings. Plaintiff further argued that such expectations were reasonable and that it would be unfair not to honor them.

 In support of that contention, plaintiff emphasized that the mediation took place expressly under the auspices of this court's ADR program—and that there has been in effect in this court for a good many years a local rule that purports to fix the terms under which mediation confidences will be protected. ADR Local Rules for

---

**15.** We appreciate that some courts would distinguish between a "privilege" and a mandate to maintain or a promise of confidentiality. *Folb,* 16 F.Supp.2d at 1171–72; *United States v. Phoenix Union High School Dist.,* 681 F.2d 1235, 1237 (9th Cir.1982); *Nguyen Da Yen v. Kissinger,* 528 F.2d 1194, 1205 (9th Cir.1975); *In re Grand Jury Subpoena Dated December 17, 1996,* 148 F.3d 487, 492 (5th Cir.1998). While there may be substance and significance to this distinction in some settings, it is not clear that this is one. A privilege, it has been suggested, empowers its holder to use the legal process to prevent others from disclosing protected communications and vests the holder with a right to refuse to produce otherwise relevant evidence. But I don't understand why much the same power and right would not be conferred on a participant in a mediation by a court rule or statute that provided "for the confidentiality of the alternative dispute resolution processes and . . . prohibit[ed] disclosure of confidential dispute resolution communications." 28 U.S.C. § 652(d). I would think that a party to a mediation would have standing to enforce such a prohibition if another party sought to disclose or use a protected communication. Similarly, a party from whom evidence about protected communications was sought could seek to protect itself by invoking such a rule. In some circumstances judges might decide

that competing considerations of great magnitude required some invasion of the otherwise protected sphere, but that also is possible with virtually all "privileged" communications. On the other hand, there may well be greater judicial reluctance to compel disclosure when the word "privilege" attaches, especially if the privilege is hoary and central to long-standing perceptions of professional self-·interest.

We decline to accept, however, the notion that the proviso of F.R.E. 501 does not apply whenever a state fails formally to label the protection it offers to mediation communications a "privilege," using instead language that promises and mandates confidentiality. We would view such an analytical out as little more than a semantic slight of hand.

Similarly, it would elevate form over substance to suggest that F.R.E. 501 could not be implicated by an invocation of § 652(d) of ADR Act because that section does not in terms create a "privilege" (but merely promises and mandates confidentiality). And there clearly could be tension between the promise of confidentiality in § 652(d) and a state privilege law that offered very little protection to mediation communications—even though the two sources of law might fall into conceptually separable pigeon holes.

the U.S. District Court for the Northern District of California, ADR–L.R. 6–11.[16]

Plaintiff also might have pointed out that in the fall of 1998, less than two months after the mediation in issue here occurred, Congress enacted and the President signed into law the Alternative Dispute Resolution Act of 1998—an Act which includes an express statement of federal policy that communications occurring in mediations sponsored by federal district courts should be confidential. In § 652(d) of the Act, Congress directed each federal district court (until national rules are adopted under 28 U.S.C. § 2071—a process not likely to be completed for years) to "provide [through duly adopted local rules] for the confidentiality of the alternative dispute resolution processes and to prohibit disclosure of confidential dispute resolution communications." 28 U.S.C. § 652(d). While this Act had not yet become law at the time the mediation in this case occurred, it became law well before · defendants' filed their motion to enforce the settlement agreement—and plaintiffs might argue that local rules sanctioned by this statute should control disposition of disputes that arise after the statute's effective date (October 30, 1998).

The core problem in plaintiff's approach is that it ignores the express provision of Federal Rule of Evidence 501 that appears to be applicable here. That provision, which was self-consciously crafted by Congress itself (rather than by a committee of the Judicial Conference), directs that "in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness . . . shall be determined in accordance with State law." Defendants' motion to enforce the settlement agreement is a civil proceeding in which state law, and only state law, provides the rule of decision. The only question that motion raises is whether the parties entered an enforceable contract at the conclusion of the mediation—and the rule of decision for resolving this one substantive question will have only one source— the substantive law of the state of California.

Given these undisputed and foreseeable circumstances, the parties should have understood, before their mediation, that if, later, one party initiated proceedings designed to secure a determination that the mediation produced an enforceable settlement contract, disputes about the confidentiality of mediation communications would be resolved in those proceedings by applying the law of the state of California. Because the parties should have foreseen the applicability of state privilege law in a proceeding like this,[17] any contrary expec-

---

**16.** "(a) **Confidential Treatment.** This court, the mediator, all counsel and parties, and any other persons attending the mediation shall treat as confidential all written and oral communications made in connection with or during any mediation session. The court hereby extends to all such communications all the protection afforded by FREvid 408 and FRCivP 68. In addition, unless otherwise stipulated by all parties and the mediator, the court hereby prohibits disclosure of any written or oral communication made by any party, counsel, mediator or other participant in connection with or during any mediation to anyone not involved in the litigation. Nor may such communication, absent stipulation by all parties and the mediator, be disclosed to the assigned judge or used for any purpose, including impeachment, in any pending or future proceeding in this court. . . . (c) **Stipulation.** Communications made in connection with or during a mediation may be disclosed

only if all parties and the mediator so agree . . . ."

As this opinion makes clear, there may be unusual circumstances in which—despite the apparently unyielding prohibitions of this Local Rule—courts will feel constrained to order disclosure of otherwise confidential ADR communications.

The court notes that the Local Rules Committee for U.S. District Court for the Northern District of California currently is considering amending ADR–L.R. 6–11.

**17.** We hasten to emphasize that our ruling leaves many circumstances in which issues related to the confidentiality of mediation communications will be resolved under federal law. For example, if this case, over which we have jurisdiction by virtue of a claim arising under federal law, were to proceed to trial on the merits of plaintiff's underlying claims, we would use federal law to determine whether a party could discover or intro-

tation they had in fact was unreasonable—and it would not be unfair not to honor it.

It also is pertinent to the fairness argument that California has offered for some time a set of strong statutory protections for mediation communications (we discuss these below). If anything, those state law protections might be stronger than the protections offered through the relevant local rule of the Northern District of California or through any federal common law mediation privilege that might have been emerging when the mediation took place in this case. *Folb*, 16 F.Supp.2d 1164. Thus plaintiff could not argue persuasively that she was misled to her detriment by relying on the Northern District's local confidentiality rule, or on a federal common law mediation privilege. Such an argument would have moral force only if the state whose law would apply the rule of decision offered much less (or no) protection to mediation communications.

Independent of her fairness arguments, plaintiff might contend that when it adopted § 652(d) of the ADR Act of 1998 Congress intended to super-impose a modest limitation on what otherwise would be the reach of Rule 501. Plaintiff's argument might proceed along the following lines. By enacting § 652(d) Congress evidenced its view that there is a strong federal interest in protecting the confidentiality of communications that occur in mediations sponsored by federal district courts. Citing the 1974 Advisory Committee Notes to F.R.E. 501, plaintiff might proceed by arguing that the "rationale underlying the proviso [that federal courts must apply state privilege law when the evidence is relevant to a claim that would be resolved by state law] is that federal law should not supersede that of the States in substantive areas such as privilege *absent a compelling reason*." (Emphasis added.) At the time F.R.E. 501 was adopted (1974–75), Congress felt that "there was no federal interest strong enough to justify departure from State

[privilege] policy" when, in a civil case in federal court, state law provided the rule of decision. But, the argument would go, times have changed dramatically since 1975, especially in the growth and legitimization of court-connected ADR, so that by 1998 Congress had determined that a strong federal interest did exist in protecting the confidentiality of communications made during mediations sponsored by federal district courts. By ordering district courts to adopt rules that would "prohibit disclosure of confidential dispute resolution communications," Congress articulated a strong national policy on this question—a policy that Congress would not want frustrated by state legislatures that did not share Congress's view about the importance of confidentiality in court-sponsored ADR proceedings.

The central difficulty with this line of argument is that, to my less than comprehensive knowledge, it is supported by nothing in either the language or the legislative history of the ADR Act. We are constrained to assume that the Congress that enacted this statute was well aware of F.R.E. 501. We also are constrained to assume that Congress knew that the current version of F.R.E. 501 was the product of heated debate and considerable self-consciousness—and that the proviso in question here reflected an important Congressional judgment about where to strike the balance between competing state and federal interests in this sensitive arena. Moreover, the balance that Congress struck left matters of considerable potential consequence to the outcome of litigation in federal courts vulnerable to compromise or erosion by state law (when state law supplied the rule of decision)—*e.g.*, whether communications between a lawyer and client were privileged at all. Congress obviously knew, in 1975, that under federal law there were strong protections for confidential attorney-client communications. Despite knowing that,

duce evidence about what occurred during the mediation. Thus, the court's local rule

about mediation confidentiality is certainly not superfluous.

Congress decided that it could and should live with the possibility that such communications would receive no protection at all in a civil action in federal court when a state law provided the substantive rule of decision.

One point of all this is that the proviso in F.R.E. 501 was in 1975 and remains today a big deal—and because it is a big deal, we should assume that Congress would change it only after a visible public debate and only through a direct and unequivocal pronouncement. We should not base a finding that there has been a change in a rule of such significance on inferences about intersections of law that there is no evidence Congress saw.

Given the relative paucity of public debate surrounding the ADR Act, it is considerably more likely than not that Congress devoted no thought at all to the possible implications of § 652(d) for F.R.E. 501.

It also is noteworthy that when Congress passed the ADR Act it did not provide directly for the protection of confidential ADR communications or prescribe specifically what the protection should consist of. Instead, Congress articulated a generalized mandate under which each district court, on an unspecified time frame, was to adopt its own local rule. This approach foreseeably left open the substantial possibility that there would be considerable differences between the local rules different courts adopted (and that a considerable period would elapse before all 94 district courts had rules in place directed to this matter). It is not likely that Congress intended to give 94 district courts the power to vary in potentially quite different ways the proviso in Rule 501.

Nor could plaintiff persuasively invoke "preemption" doctrines to foreclose a role in this setting for state privilege law. It is not rationally arguable that Congress intended, through a section of a statute that could apply only in mediations conducted under the sponsorship of a federal district court, to displace entirely the power of the states to enact laws addressing the confidentiality of mediations occurring outside federal court programs, e.g., in state court programs or in a purely private setting. Congress clearly knew that there are state laws on the subject of mediation confidentiality [18] and Congress clearly did not intend to abrogate them. So, at the time it enacted § 652(d), Congress knew that there would continue to be state laws on this subject. At the same time Congress also knew about F.R.E. 501 and how it operates when state laws provide the rule of decision. Given this knowledge, we would expect a Congress that had a preemptive intent to be quite explicit in articulating that intent. Neither the language nor the legislative history of the ADR Act includes even a hint of any such intent.

Of course, there have been instances in which courts have inferred intent to preempt—but they have done so only rarely and only in compelling circumstances, e.g., when it would be physically impossible to comply with both state and federal regulations of the same subject, or when operation of a state law necessarily would prevent achievement of an important purpose that Congressional legislation clearly was designed to achieve. But we are warned by the precedents not to rush to assumptions about conflicts between federal and state laws. We are admonished to be careful not to invoke pre-emption doctrines unless the conflict is both real and "inexo-

---

18. As we note in the text, below, one survey concluded that by 1997 forty-nine (49) states and the District of Columbia had adopted laws that afforded some privilege or confidentiality protection to mediation communications. *Folb,* 16 F.Supp.2d at 1179, *citing* Pamela A. Kentra, "Hear No Evil, See No Evil, Speak No Evil: The Intolerable Conflict for Attorney–Mediators Between the Duty to Maintain Confidentiality and the Duty to Report Fellow Attorney Misconduct," 1997 B.Y.U.L.Rev. 715, Appendix A. Many states also extend protection on a generic basis to communications made in connection with settlement negotiations. *E.g.,* Cal.Evid.Code § 1152; N.Y.C.P.L.R. (Evid.) § 4547.

rable." *Jones v. Rath Packing Co.*, 430 U.S. 519, 545, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977).

So admonished, we begin by observing that it is not at all clear that there is any conflict in this case between § 652(d) and the pertinent California mediation privilege laws. California's statutes on this subject aggressively extend confidentiality protection to mediation communications. There is no basis for inferring that these state laws offer less protection than Congress intended the federal judiciary to offer through the rule making process.

Plaintiff might argue, however, that in conducting a pre-emption analysis we cannot confine our field of vision to any one state's law, but that we must canvass all state rules on this subject to determine how much tension exists, nationwide, between § 652(d) and norms adopted in the states. Plaintiff might continue by contending that the objective Congress sought to achieve through § 652(d) would be gravely jeopardized if there were states that refused to offer any protection at all to mediation communications, or that offered only conditional and very limited protection.

While we have not attempted to survey the relevant law in all of the states, we acknowledge that these arguments would have some force in a state that offered no protection to mediation communications.[19] We assume that when it adopted § 652(d) Congress' primary purpose was to encourage maximum use of court-sponsored mediation opportunities, and that Congress believed that litigants and lawyers would not realize the full potential of mediation unless they believed the proceedings would be confidential. Parties to a mediation sponsored by a federal court located in a state that had rejected the notion that mediation communications should be protected could not feel confident, under the rulings we make here, that what they said during the mediation would not be disclosed in subsequent proceedings to enforce purported settlement contracts, even if the district court's local rule purported to promise absolute confidentiality.

We also note that if the basis for subject matter jurisdiction was diversity of citizenship, F.R.E. 501 would require application of state privilege law in all phases of the proceedings in federal court—and if the state's law was that mediation communications receive no protection, there would be no shield around the mediation proceedings. Moreover, as we see in the case at bar, motions to enforce alleged settlement contracts would pose a separate threat to confidentiality in all civil cases in federal court—even cases in which the sole claim arose under federal law. Because such motions sound in state contract law, under F.R.E. 501 all privilege issues would be governed by state law. And if the law of the relevant state granted no protection to mediation communications, those communications could be used as evidence (absent some other evidentiary basis for exclusion) in the action to determine whether the parties had in fact entered a settlement contract and, if so, what its terms were.

Thus, in a state where mediation or settlement communications were unprotected, parties to mediations in federal court would be faced with the prospect that their communications might well be used against them in a proceeding to enforce an alleged settlement contract. So even in cases in federal court on federal questions, the district court could not offer participants in mediation full assurance that their communications could never be used against them. To this extent, the existence of state laws that offer no protection to mediation communications, or only very limited protection, would pose a threat to the full achievement of the pur-

---

19. In determining how much protection any given state offers to mediation communications courts should be careful not to limit their inquiry to whether the state recognizes a "mediation" privilege. Protection for mediation communications also might be found in statutes or rules related to settlement negotiations or to offers of compromise or judgment.

poses that Congress apparently sought to achieve through § 652(d).

As we discuss below, however, we should not simply assume that this threat is large. The percentage of mediated cases in which the parties end up litigating the question of whether the mediation produced an enforceable settlement contract probably is extremely small—and counsel are likely to understand that. In California, at least, the size of this group of cases is made even smaller by the fact that enforcement proceedings are possible only when the mediation produced a writing that appears to constitute. an enforceable contract; a contention that the alleged settlement agreement was oral would be rejected out of hand. *See, Ryan v. Garcia,* 27 Cal. App.4th 1006, 33 Cal.Rptr.2d 158 (3d Dist. 1994).

Moreover, the size of this threat is largely a function of the extent to which state laws offer protection to mediation communications—either directly through rules or legislation related to mediation or indirectly through more generic provisions related to settlement communications. According to one survey, by 1997 no fewer than 49 states and the District of Columbia had "adopted a mediation privilege of one type or another" and "a majority of the states go beyond protecting communications in private sessions with the mediator, requiring that the entire process be confidential." *Folb,* 16 F.Supp.2d at 1179, *citing* Pamela A. Kentra, "Hear No Evil, See No Evil, Speak No Evil: The Intolerable Conflict for Attorney–Mediators Between the Duty to Maintain Confidentiality and the Duty to Report Fellow Attorney Misconduct," 1997 B.Y.U.L.Rev. 715, Appendix A.

Given the rarity of formal proceedings to enforce settlement agreements and the substantial protection that most states extend to mediation communications, it appears that continuing to apply F.R.E. 501 as written would in fact pose very little real threat to achieving the purposes of § 652(d). And even though uncertainty can induce more conservatism (at least in lawyers) than statistical probabilities, we cannot conclude that the remote possibility of disclosure during enforcement proceedings is likely to have a substantial adverse impact on freedom of communication in mediations.

But even if we believed that continuing to apply the proviso of F.R.E. 501 in settings like this posed a more substantial threat, we would be most reluctant to use pre-emption doctrine to support a conclusion that federal courts should not apply state confidentiality or privilege law when the rule of decision is supplied by state law. That reluctance is rooted, in part, in our belief that there is no "inexorable" conflict between § 652(d) and any state law that might be applicable under a traditional reading of F.R.E. 501. Such conflict could be "inexorable" *only if we assume* that Congress decided in 1998 that it could no longer live with the proviso in F.R.E. 501, a rule that Congress itself fashioned. As we pointed out above, there is no basis for any such assumption. It is much more likely that Congress intended Rule 501 to continue to operate as it has for more than two decades—with the result that federal and state law, even where very different, can continue to operate without conflict because they operate in separate spheres—spheres whose boundaries have been fixed by Congress in F.R.E. 501.

■ Having considered and rejected the arguments that might support a contrary result, we conclude that even when a local rule adopted by a federal district court pursuant to § 652(d) offers more protection to mediation communications than would be offered by the law of the state where the district court sits, the federal court must apply state privilege law when state substantive law is the source of the rule of decision on the claim to which the proffered evidence from the mediation is relevant.

■ There is one additional "matter" about which a choice of law question has arisen at this juncture. Is this federal

district court bound, under *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and its progeny, or under F.R.E. 501, to follow the *procedures* that the courts of the state of California would follow when the court goes about determining what evidence from the mediation, if any, to admit at the hearing to determine whether the parties entered an enforceable settlement contract? One difficult question we face, for example, is whether to admit testimony from the mediator. The only California court of appeal to squarely address this question has concluded, albeit in a quite different setting than we confront here,[20] that the appropriate procedure is to have the mediator examined *in camera* in advance of the substantive proceedings. The California court reasoned that the *in camera* examination would cause less harm to the interests that underlie the mediator's privilege than testimony during the proceedings in chief, and that with the benefit of the *in camera* testimony, the court would be positioned to determine reliably how much harm, if any, would be done to the defendant's interests in a fair process if the mediator's testimony was excluded. Are we, as a federal district court presiding over proceedings to determine whether the parties entered an enforceable settlement agreement, required to follow this procedure?

Our answer, unaccompanied by complete confidence, is no. While the line here between "procedure" and "substance" (for *Erie* purposes) is not broad and bright, we think this issue is most fairly characterized as "procedural." In reaching this conclusion we acknowledge that different procedures could invade to different extents the sphere of privacy that the California mediation privileges are designed to protect. What the substantive privilege law in issue here protects is confidentiality, and use of an insensitive procedure to determine the

probative significance of the protected communications could cause severe damage to the substantive California privilege rights.

But the issue is not whether federal courts should be free, in deciding whether to admit evidence from the mediation, to follow a procedural course that results (over objection) in uncabined public exposure of the communications that otherwise would be protected. No such suggestion is made here.

Rather, the issue is this: must federal courts, in crafting procedures designed to invade as little as possible the interests that support the state privilege law, while assaying the evidentiary importance of the otherwise protected communications, use the exact same procedures that California courts have chosen to use for this purpose? As I understand the weight of authority, the *Erie* doctrine was not intended to impose any such procedural straight jacket on federal tribunals. As long as the procedure the individual federal court adopts is appropriately sensitive to the competing interests, and does not result in premature, unjustified, or wholesale disclosure of the protected communications, there would be no offense to *Erie* and its progeny or to F.R.E. 501. An appropriate procedure in federal court would substantially parallel in *effect* the procedure adopted by the courts of California, and, in that parallelism, would cause no greater harm to substantive privilege interests than California courts would be prepared to cause.

In the proceedings at bar, I decided not to hold a separate *in camera* proceeding, in advance of the evidentiary hearing, to determine what the mediator's testimony would be. Proceeding in that manner, especially in the circumstances of this case, would have created a substantial risk that

---

**20.** *Rinaker v. Superior Court,* 62 Cal.App.4th 155, 74 Cal.Rptr.2d 464 (3d Dist.1998). *Rinaker* involved a juvenile delinquency proceeding which carried the potential for confinement and other sanctions. A witness offered by the prosecution had participated in a ·mediation. The juvenile defendant sought that mediator's testimony in order to impeach the adverse witness. The *Rinaker* court was called upon to determine whether, under those circumstances, to compel and admit the mediator's testimony.

the mediator would be required to testify twice—first *in camera*, then during the hearing itself. This followed, in part, because I was not at all confident that the parties could identify, before hearing testimony from the other participants to the mediation, all the questions that the mediator would need to be asked to reliably explore the issues that would arise during the evidentiary hearing.

Moreover, I knew that the mediation had lasted many hours, and I had substantial reason to believe that the mediator had had considerable interaction with the plaintiff—probably appreciably more such interaction than any witness connected with the parties seeking to enforce the apparent settlement.[21] So it was foreseeable that the mediator would have considerable personal knowledge of matters central to disposition of the pending motion. I also could foresee a substantial likelihood that there would be directly contradictory testimony from the interested parties on the crucial issues—and that, relative to all the other witnesses, the mediator's testimony was least likely to be infected (unconsciously or otherwise) by self-interest or some other motivation that would raise obvious questions about accuracy.[22]

21. The one person who foreseeably had more exposure to the plaintiff and her condition during the mediation was her then lawyer, Phyllis Voisenat. For reasons set forth in a subsequent section of this opinion, however, it was foreseeable that uncertainties would be raised, by the plaintiff and by the circumstances, about the reliability of her testimony.

22. As I explained on the record to the parties near the beginning of the hearing, it did not follow from the fact that Mr. Herman was an employee of the court and enjoyed considerable respect as a mediator (in the community at large and from all the parties to this case) that I would simply assume that his testimony was accurate. In many instances, "credibility" has little to do with whether the witnesses are "honest." I explained to the parties that, like them, I had confidence in Mr. Herman's moral integrity and his honesty—but that there is no necessary equation between honesty and accuracy. Many witnesses are honest, meaning that they believe they are telling the truth, but inaccurate. Giving accurate testimony is a complex undertaking—and determining what the real world facts are requires a court to attend carefully to *all* the evidence, regardless of its source.

It also is important for the parties to understand that I appreciate the possibility that a mediator might have interests or motives that could affect the accuracy of his or her testimony in a setting like this. It is safe to assume that mediators would like their work to be productive or "successful," and that some mediators measure success by whether or not the parties reached a settlement. A mediator who so measures his success might have a vested psychological interest in testifying that the mediation process led the parties to enter a settlement contract.

Moreover, it is reasonable to assume that at least some mediators want to perceive themselves as both sensitive and fair—so they would be unhappy if the court found that they had failed to understand that a party to the mediation was in acute or disabling emotional distress at the decisive juncture in the mediation, or was mentally incompetent to make the kinds of decisions and commitments the mediator called upon the party to make. Similarly, we should expect good mediators not to want a court to find that they had permitted a truly disabled party to sign a contract under duress, or to execute an agreement whose essentials they did not understand, or to be unfairly victimized by an obviously more powerful or sophisticated opponent. So when a party to the mediation claims not to have understood the document she signed, or to have been emotionally and or physically incapacitated when called upon to decide whether to enter an agreement, or to have been overborne by her opponent and the circumstances, it would not be surprising if one of a mediator's reactions was defensive. A natural reaction by a mediator to such claims would be denial—an assertion that the mediator would never let something like that happen. Such a defensive reaction could infect testimony.

It is important to me that the parties understand that I understand all these possibilities. It also is important to emphasize, however, that there is a substantial difference between possibility and actuality—that possibility and inevitability are quite different things. The question is not whether Mr. Herman might have felt some of these emotions—the question is whether he permitted any such emotions to play any meaningful role in how he testified. As explained in a later section of the text, I have concluded, after considering all the evidence, that Mr. Herman resisted any temptation he might have felt to defend his work and that he testified carefully and accurately about what occurred during the mediation.

Given all these case-specific considerations, I decided that there was an alternative procedural course that was likely to be fairer, more efficient, and at least comparably sensitive to the interests underlying the mediator's privilege. Having decided, for reasons set forth below, that fairness required the court to take evidence from the mediator in this case, I elected to call the mediator to the witness stand after the other principal participants in the September 10, 1998, mediation had testified. But, importantly, I also decided to take the testimony from the mediator in closed proceedings, under seal. After hearing his testimony in this protected setting, and after considering all the other evidence adduced during the hearing, I was positioned to determine much more reliably whether, or to what extent, overriding fairness interests required me to use and publicly disclose testimony from the mediator in making my decision about whether the parties had entered an enforceable settlement contract.

### PERTINENT CALIFORNIA PRIVILEGE LAW

The California legislature has crafted two sets of statutory provisions that must be addressed by courts considering whether they may use in a subsequent civil proceeding any evidence about what occurred or was said during a mediation.

Section 703.5 of the California Evidence Code states, in pertinent part: "No person presiding at any judicial or quasi-judicial proceeding, and no arbitrator or mediator, shall be competent to testify, in any subsequent civil proceeding, as to any statement, conduct, decision, or ruling, occurring at or in conjunction with the prior proceeding, except as to a statement or conduct that could [give rise to contempt, constitute a crime, trigger investigation by the State Bar or the Commission on Judicial Performance, or give rise to disqualification proceedings]."

We note, before proceeding, that by its express terms § 703.5 applies (as pertinent here) only to statements or decisions made, or conduct occurring, in connection with a mediation. Read literally, this statute would not apply to perceptions of participants' appearance, demeanor, or physical condition during a mediation. We also note, however, that compelling mediators to testify or otherwise offer evidence about *anything* that occurred or was perceived during a mediation threatens confidentiality expectations of the participants and imposes burdens on mediators—and that such threats and burdens tend, at least in some measure, to undermine interests that the California legislature likely sought to protect when it enacted this statute. In construing and applying this statute, we endeavor to honor the purposes that drive it.

The other directly pertinent provision from the California Evidence Code is § 1119. It states, in pertinent part: "Except as otherwise provided in this chapter: (a) No evidence of anything said or any admission made ... in the course of, or pursuant to, a mediation ... is admissible or subject to discovery, and disclosure of the evidence shall not be compelled, in any ... noncriminal proceeding.... (b) No writing ... prepared in the course of, or pursuant to, a mediation ... is admissible or subject to discovery, and disclosure of the writing shall not be compelled in any ... noncriminal proceeding.... (c) All communications ... by and between participants in the course of a mediation ... shall remain confidential."

Of the other provisions that expressly qualify the prohibitions set forth in section 1119, the most important for our purposes is § 1123. It states that "[a] written settlement agreement prepared in the course of, or pursuant to, a mediation, is not made inadmissible, or protected from disclosure ... if the agreement is signed by the settling parties and ... (b) The agreement provides that it is enforceable or binding or words to that effect."

As noted above, the "Memorandum of Understanding" that the parties executed at the end of the mediation session in this case states expressly that it "is intended as

a binding document itself." No party contends that this MOU is inadmissible.

## WAIVERS BY THE PARTIES (BUT NOT THE MEDIATOR) OF THEIR MEDIATION PRIVILEGE

█ As we noted earlier, the plaintiff and the defendants have expressly waived confidentiality protections conferred by the California statutes quoted above.[23] Both the plaintiff and the defendants have indicated, clearly and on advice of counsel, that they want the court to consider evidence about what occurred during the mediation, including testimony directly from the mediator, as the court resolves the issues raised by defendants' motion to enforce the settlement agreement.

Faced with a document that on its face appears to be an enforceable settlement contract, and contending that her apparent consent was not legally valid because of serious temporary impairments in her mental, emotional, and physical condition, plaintiff's waiver reaches not only perceptions by other participants of her appearance, demeanor, condition, and conduct during the mediation, but also their recollections of what she said and what others said in her presence. Her waiver expressly covers testimony about such matters not only by opposing counsel and parties, but also by the mediator and by her then lawyer, Ms. Voisenat.[24] It covers group sessions as well as private caucuses.

While not as complete, defendants' waivers also are substantial. Defendants have not relinquished their right to protect the confidentiality of communications between them and their counsel, or the private communications between the mediator and them or their lawyers. They have stipulated, however, that evidence may be admitted about perceptions and communications made during group sessions—and they have actively sought the testimony of the mediator about his perceptions in and recollections from both the group sessions and his private caucuses with plaintiff or Ms. Voisenat.

The plaintiff and the defendants have made the waivers discussed above on the record, through counsel (plaintiff has directly participated in the hearings in which her waivers have been made). In addition, the court described the waivers with particularity in its Order Re July 21, 1999 Status Conference, filed July 23, 1999. At the beginning of the evidentiary hearing the parties acknowledged and affirmed these waivers in writing by affixing their signatures below the relevant paragraphs on a copy of that July 23rd Order.[25] These waivers are deemed sufficient under § 1122(a)(1) of the California Evidence

---

**23.** In *Rinaker v. Superior Court*, 62 Cal. App.4th 155, n. 3 at 164, 74 Cal.Rptr.2d 464 (3d Dist.1998), the California Court of Appeal noted that the "confidentiality provided by section 1119 may be waived," citing section 1122 of the California Evidence Code.

The wording of section 1122, however, suggests that waivers by the parties would not be sufficient to make disclosure of mediation communications lawful if the mediator (and any other participants in the mediation, like non-party witnesses) did not also waive the protections of section 1119. Section 1122 requires waivers by "[a]ll persons who conduct or otherwise participate in the mediation...." As discussed in the text, we proceeded on the assumption that the mediator, Mr. Herman, did not waive his rights under either section 1119 or section 703.5.

While it is clear that the parties have rights under section 1119, whether parties have standing to invoke section 703.5 is much less

clear. We need not reach that issue, however, as we have construed the parties' broad, unqualified waivers as covering any rights they might arguably have under section 703.5.

**24.** Ms. Olam also expressly waived her protections under the attorney-client privilege—as to communications before and during the mediation between her and her then lawyer, Ms. Voisenat.

**25.** As previously noted, plaintiff responded to the July 23, 1999 Order by clarifying that she had not decided whether she would waive any privilege that might attach to communications between plaintiff and Mr. Herman *after* the mediation. On August 23, 1999, plaintiff expressly decided to waive any privilege that might attach to communications between plaintiff and Mr. Herman *after* the mediation when she signed the court's July 23, 1999 Order.

Code to remove § 1119 as a barrier to admission of the evidence the court accepted during the evidentiary hearing.[26]

## THE MEDIATOR'S PRIVILEGE

■ California law confers on mediators a privilege that is independent of the privilege conferred on parties to a mediation. By declaring that, subject to exceptions not applicable here, mediators are incompetent to testify "as to any statement, conduct, decision, or ruling, occurring ,at or in conjunction with [the mediation]," section 703.5 ·of the Evidence Code has the effect of making a mediator the holder of an independent privilege. Section 1119 of the Evidence Code appears to have the same effect—as it prohibits courts from compelling disclosure of evidence about mediation communications and directs that all such communications "shall remain confidential." As the California Court of Appeal recently pointed out, "the Legislature intended that the confidentiality provision of section 1119 may be asserted by the mediator as well as by the participants in the mediation."[27] It follows that, under California law, a waiver of the mediation privilege by the parties is not a sufficient basis for a court to permit or order a mediator to testify. Rather, an independent determination must be made before testimony from a mediator should be permitted or ordered.

■ In the case at bar, the mediator (Mr. Herman) was and is an employee of the federal court (a "staff neutral"). He hosted the mediation at the behest of the court and under this court's ADR rules. These facts are not sufficient to justify ordering him to testify about what occurred during the mediation—even when the parties have waived their mediation privilege and want the mediator to testify. Mr. Herman is a member of the California bar—and no doubt feels bound to honor the directives of California law. He also is a professional in mediation—and feels a moral obligation to preserve the essential integrity of the mediation process—an integrity to which he believes the promise of confidentiality is fundamental.

Out of respect for these feelings, the court chose not to put Mr. Herman in an awkward position where he might have felt he had to choose between being a loyal employee of the court, on the one hand, and, on the other, asserting the mediator's privilege under California law. Instead, the court announced that it would proceed on the assumption that Mr. Herman was respectfully and appropriately asserting the mediator's privilege and was formally objecting to being called to testify about anything said or done during the mediation.

Regardless of whether Mr. Herman invoked the mediator's privilege, the wording of section 703.5 can be understood as imposing an independent duty on the courts to determine whether testimony from a mediator should be accepted. Unlike some other privilege statutes, which expressly confer a right on the holder of the privilege to refuse to disclose protected communications, as well as the power to prevent others from disclosing such communications,[28] section 703.5 is framed in

26. *Rinaker's* finding that the confidentiality provisions of § 1119 must give way to the minor's right to effective cross-examination and impeachment of an adverse witness demonstrates that the confidentiality provisions of § 1119 are not absolute.

27. *Rinaker v. Superior Court,* 62 Cal.App.4th 155, n. 2 at 163, 74 Cal.Rptr.2d 464 (3d Dist.1998) (relying in part on § 1127 of the California Evidence Code).

As we pointed out in footnote 23, the wording of section 1122 of the Evidence Code suggests that it would not be lawful, on a

waiver theory, to disclose confidential mediation communications unless *all* the people who participated in the mediation, including the mediator and any non-parties, also waived their rights under section 1119.

28. The wording of the statute that codifies the lawyer-client privilege provides an instructive contrast. Section 954 of the Evidence Code declares, in pertinent part, that "the client ... has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer...."

terms of competence to testify. In its pertinent part, it declares that (subject to exceptions not applicable here) a mediator is not competent to testify "in any subsequent civil proceeding" about words uttered or conduct occurring during a mediation. This wording appears to have two consequences: it would not empower a mediator to prevent others from disclosing mediation communications, but it would require courts, on their own initiative, to determine whether it would be lawful to compel or permit a mediator to testify about matters occurring within a mediation.

So the issue of whether it was appropriate under California law in these circumstances to compel the mediator to testify was squarely raised both by the court's assuming that Mr. Herman invoked the applicable statutes and by the court's understanding of its independent duty to address this question.

Before turning to other elements of our analysis of this issue, it is important to emphasize one critical and undisputed fact: at the end of the mediation, the parties and their lawyers signed a document, typed clearly by the mediator, which appears on its face to contain the essential terms of an agreement, which expressly states that it "is intended as a binding document itself," and which affirms the parties' agreement that "the court will have continuing jurisdiction over the enforcement of this memorandum of understanding as well as the ultimate settlement agreement and any disputes arising therefrom...."

The fact that the parties and their lawyers signed such a document at the end of the mediation permits California courts to proceed to consider, in a hearing to determine whether the parties entered an enforceable contract, whether to admit evidence about what was said and done during the mediation itself. If there were no signed writing, and the alleged contract was oral, California law would not permit courts to use evidence from the mediation itself to determine whether an enforceable

agreement had been reached. *See, Ryan v. Garcia,* 27 Cal.App.4th 1006, 33 Cal. Rptr.2d 158 (3d Dist.1994) (applying and interpreting what was then section 1152.5 of the California Evidence Code, a predecessor to the current version of section 1119 of that Code).

We turn to the issue of whether, under California law, we should compel the mediator to testify—despite the statutory prohibitions set forth in sections 703.5 and 1119 of the Evidence Code. The most important opinion by a California court in this arena is *Rinaker v. Superior Court,* 62 Cal.App.4th 155, 74 Cal.Rptr.2d 464 (3d Dist.1998). In that case the Court of Appeal held that there may be circumstances in which a trial court, over vigorous objection by a party and by the mediator, could compel testimony from the mediator in a juvenile delinquency proceeding (deemed a "civil" matter under California law). The defendant in the delinquency proceeding wanted to call the mediator to try to impeach testimony that was expected from a prosecution witness. That witness and the delinquency defendant had earlier participated in a mediation—and the delinquency defendant believed that the complaining witness had made admissions to the mediator that would substantially undermine the credibility of the complaining witnesses testimony—and thus would materially strengthen the defense. In these circumstances, the *Rinaker* court held that the mediator could be compelled to testify if, after *in camera* consideration of what her testimony would be, the trial judge determined that her testimony might well promote significantly the public interest in preventing perjury and the defendant's fundamental right to a fair judicial process.

■ In essence, the *Rinaker* court instructs California trial judges to conduct a two-stage balancing analysis. The goal of the first stage balancing is to determine whether to compel the mediator to appear at an *in camera* proceeding to determine precisely what her testimony would be. In this first stage, the judge considers all the

circumstances and weighs all the competing rights and interests, including the values that would be threatened not by public disclosure of mediation communications, but by ordering the mediator to appear at an *in camera* proceeding to disclose only to the court and counsel, out of public view, what she would say the parties said during the mediation. At this juncture the goal is to determine whether the harm that would be done to the values that underlie the mediation privileges [29] simply by ordering the mediator to participate in the *in camera* proceedings can be justified—by the prospect that her testimony might well make a singular [30] and substantial contribution to protecting or advancing competing interests of comparable or greater magnitude.

The trial judge reaches the second stage of balancing analysis only if the product of the first stage is a decision to order the mediator to detail, *in camera*, what her testimony would be. A court that orders the *in camera* disclosure gains precise and reliable knowledge of what the mediator's testimony would be—and only with that knowledge is the court positioned to launch its second balancing analysis. In this second stage the court is to weigh and comparatively assess (1) the importance of the values and interests that would be harmed if the mediator was compelled to testify

(perhaps subject to a sealing or protective order, if appropriate), (2) the magnitude of the harm that compelling the testimony would cause to those values and interests, (3) the importance of the rights or interests that would be jeopardized if the mediator's testimony was not accessible in the specific proceedings in question, and (4) how much the testimony would contribute toward protecting those rights or advancing those interests—an inquiry that includes, among other things, an assessment of whether there are alternative sources of evidence of comparable probative value.

Before undertaking this two-stage task in the case at bar we must acknowledge an analytical curiosity about the *Rinaker* opinion. The *Rinaker* court focused on section 1119 of the California Evidence Code—but did not mention section 703.5. Apparently the mediator who litigated this issue chose to rely on section 1119 and did not invoke section 703.5. We are left to speculate about why the Court of Appeal did not consider section 703.5 on its own initiative.[31] One possibility is that the Court viewed these two provisions of the Evidence Code, at least in a setting where it is a mediator (not a judge) who is objecting to being called to testify, as analytically redundant. While not couched in terms of competence to testify, section 1119

---

**29.** Cal.Evid.Code §§ 703.5 and 1119.

**30.** A "singular" contribution is one that could not be made with evidence from some other, less sensitive source. In making this determination it is not enough, of course, to determine whether evidence from other sources also is relevant to the same disputed point. Even when there are alternative sources of evidence pertinent to the same factual issue, testimony from a mediator might make a "singular" contribution if it had appreciably greater probative utility or power than the other relevant evidence. *See, Rinaker,* 62 Cal. App.4th at 171, 74 Cal.Rptr.2d 464, where the court suggests that the mediator's testimony might be of considerable probative value even if testimony from other witnesses was available on the same point—because of the possibility that the mediator's status as a disinterested witness might give her testimony especially telling probative power.

**31.** The proceeding in which the mediator's testimony was sought in *Rinaker* was a juvenile delinquency matter—and the Court of Appeal suggested that there were important parallels between such a matter and a criminal prosecution, even though the state attached the label "civil" to juvenile delinquency proceedings. But the possibility that the *Rinaker* panel considered the underlying proceedings to be closer in reality to criminal than to civil matters does not help explain why the Court of Appeal focused on section 1119 and said nothing about section 703.5. This follows because while section 703.5 applies by its express terms only to a "subsequent civil proceeding," section 1119 applies only to subsequent proceedings that are "non-criminal."

broadly prohibits the admission of evidence about things said during a mediation—and expressly directs courts not to compel disclosure of any such evidence in any non-criminal proceeding. At least in a context like the one at bar, it is not obvious that there is any difference between the pertinent mandates of these two statutes. And it is because we see no such difference that we conclude that the *Rinaker* panel and other California courts would hold that the fundamental character of the balancing analysis that we are to use to determine whether a mediator should be compelled to testify in a subsequent civil proceeding is the same under sections 703.5 and 1119.

■ So we turn now to a description of that balancing analysis.

As indicated in an earlier section, the product of the first stage of the analysis was my decision that it was necessary to determine (through sealed proceedings) what Mr. Herman's testimony would be. Reaching that determination involved the following considerations. First, I acknowledge squarely that a decision to require a mediator to give evidence, even *in camera* or under seal, about what occurred during a mediation threatens values underlying the mediation privileges. As the *Rinaker* court suggested, the California legislature adopted these privileges in the belief that without the promise of confidentiality it would be appreciably more difficult to achieve the goals of mediation programs. *Rinaker v. Superior Court, supra,* at 165–166, 74 Cal.Rptr.2d 464, citing *Ryan v. Garcia,* 27 Cal.App.4th 1006, 1010, 33 Cal. Rptr.2d 158 (3d Dist.1994). Construing an earlier version of the mediation privilege statute,[32] the same court of appeal had

opined a few years before that without assurances of confidentiality "some litigants [would be deterred] from participating freely and openly in mediation." That court also quoted approvingly the suggestion from a practice guide that "[c]onfidentiality is absolutely essential to mediation," in part because without it "parties would be reluctant to make the kinds of concessions and admission that pave the way to settlement."[33]

While this court has no occasion or power to quarrel with these generally applicable pronouncements of state policy, we observe that they appear to have appreciably less force when, as here, the parties to the mediation have waived confidentiality protections, indeed have asked the court to compel the mediator to testify—so that justice can be done.

If a party to the mediation were objecting to compelling the mediator to testify we would be faced with a substantially more difficult analysis. But the absence of such an objection does not mean that ordering the mediator to disclose, even *in camera,* matters that occurred within the mediation does not pose some threat to values underlying the mediation privileges. As the *Rinaker* court pointed out, ordering mediators to participate in proceedings arising out of mediations imposes economic and psychic burdens that could make some people reluctant to agree to serve as a mediator, especially in programs where that service is pro bono or poorly compensated.[34]

This is not a matter of time and money only. Good mediators are likely to feel violated by being compelled to give evidence that could be used against a party

**32.** *See, Ryan v. Garcia,* 27 Cal.App.4th 1006, 33 Cal.Rptr.2d 158 (3d Dist.1994) (the earlier version of the mediation privilege was set forth in § 1152.5 of the California Evidence Code, which was enacted in 1985).

**33.** *Ryan,* 27 Cal.App.4th at 1010–1011, 33 Cal.Rptr.2d 158, *quoting* Knight, et al., *Cal. Practice Guide: Alternative Dispute Resolution* (The Rutter Group 1993), § 3:25, p. 3–5.

**34.** The *Rinaker* panel wrote that it was "not unsympathetic to Rinaker's concern that unpaid mediators, like her, 'would hesitate to volunteer their time so freely if, solely as a result of conducting a mediation, they might be required to become witnesses in later litigation involving disputants.'" *Id.,* n. 5, at 167, 74 Cal.Rptr.2d 464.

with whom they tried to establish a relationship of trust during a mediation. Good mediators are deeply committed to being and remaining neutral and non-judgmental, and to building and preserving relationships with parties. To force them to give evidence that hurts someone from whom they actively solicited trust (during the mediation) rips the fabric of their work and can threaten their sense of the center of their professional integrity. These are not inconsequential matters.

Like many other variables in this kind of analysis, however, the magnitude of these risks can vary with the circumstances. Here, for instance, all parties to the mediation want the mediator to testify about things that occurred during the mediation—so ordering the testimony would do less harm to the actual relationships developed than it would in a case where one of the parties to the mediation objected to the use of evidence from the mediator.

We acknowledge, however, that the possibility that a mediator might be forced to testify over objection could harm the capacity of mediators in general to create the environment of trust that they feel maximizes the likelihood that constructive communication will occur during the mediation session. But the level of harm to that interest likely varies, at least in some measure, with the perception within the community of mediators and litigants about how likely it is that any given mediation will be followed at some point by an order compelling the neutral to offer evidence about what occurred during the session. I know of no studies or statistics that purport to reflect how often courts or parties seek evidence from mediators—and I suspect that the incidence of this issue arising would not be identical across the broad spectrum of mediation programs and settings. What I can report is that this case represents the first time that I have been

called upon to address these kinds of questions in the more than fifteen years that I have been responsible for ADR programs in this court. Nor am I aware of the issue arising before other judges here. Based on that experience, my partially educated guess is that the likelihood that a mediator or the parties in any given case need fear that the mediator would later be constrained to testify is extraordinarily small.

That conviction is reinforced by another consideration. As we pointed out above, under California law,[35] and this court's view of sound public policy, there should be no occasion to consider whether to seek testimony from a mediator for purpose of determining whether the parties entered an enforceable settlement contract unless the mediation produced a writing (or competent record) that appears on its face to constitute an enforceable contract, signed or formally assented to[36] by all the parties. Thus, it is only when there is such a writing or record, and when a party nonetheless seeks to escape its apparent effect, that courts applying California law would even consider calling for evidence from a mediator for purposes of determining whether the parties settled the case.[37] Surely these circumstances will arise after only a tiny fraction of mediations.

The magnitude of the risk to values underlying the mediation privileges that can be created by ordering a mediator to testify also can vary with the nature of the testimony that is sought. Comparing the kind of testimony sought in *Rinaker* with the kind of testimony sought in the case at bar illustrates this point. In *Rinaker*, one party wanted to use the mediator's recollection about what another party said during the mediation to impeach subsequent trial testimony. So the mediator was to serve as a source of evidence about what words a party to the mediation uttered,

---

**35.** *See,* Sections 1118, 1119, 1122, and 1123 of the California Evidence Code.

**36.** In some circumstances, assent duly recorded in a court proceeding might suffice. *Cf.* § 1118 of the California Evidence Code.

**37.** *Cf., Ryan v. Garcia,* 27 Cal.App.4th 1006, 33 Cal.Rptr.2d 158 (3d Dist.1994) (interpreting what was then section 1152.5 of the California Evidence Code).

what statements or admissions that party made.

As the Court of Appeal appeared to recognize, this kind of testimony could be particularly threatening to the spirit and methods that some people believe are important both to the philosophy and the success of some mediation processes. Under one approach to mediation, the primary goal is not to establish "the truth" or to determine reliably what the historical facts actually were. Rather, the goal is to go both deeper than and beyond history—to emphasize feelings, underlying interests, and a search for means for social repair or reorientation. In this kind of mediation, what happened between the parties in the past can be appreciably less important than why, than what needs drove what happened or were exposed or defined by what happened, than how the parties feel about it, and than what they can bring themselves to do to move on.

Moreover, the methods some mediators use to explore underlying interests and feelings and to build settlement bridges are in some instances intentionally distanced from the actual historical facts. In some mediations, the focus is on feelings rather than facts. The neutral may ask the parties to set aside pre-occupations with what happened as she tries to help the parties understand underlying motivations and needs and to remove emotional obstacles through exercises in venting. Some mediators use hypotheticals that are expressly and intentionally not presented as accurate reflections of reality—in order to help the parties explore their situation and the range of solution options that might be available. A mediator might encourage parties to "try on" certain ideas or feelings that the parties would contend have little connection with past conduct, to experiment with the effects on themselves and others of expressions of emotions or of openness to concessions or proposals that, outside the special environment of the mediation, the parties would not entertain or admit. All of this, as mediator Rinaker herself pointed out, can have precious little to do with historical accuracy or "truth." [38]

Given these features of some mediations, it could be both threatening and unfair to hold a participant to the literal meaning of at least some of the words she uttered during the course of a mediation. And testimony from the mediator about what those words were during the mediation might constitute very unreliable (actively misleading) evidence about what the earlier historical facts were.

For these reasons, a court conducting the kind of balancing analysis called for by the *Rinaker* court should try to determine what kind of techniques and processes were used in the particular mediation in issue. The more like the processes just described, the more harm would be done by trying to use evidence about what was said or done during the mediation to help prove what the earlier historical facts really were. On the other hand, if the mediation process was closer to an adjudicate/evaluative model, with a clear focus (understood by all participants) on evidence, law, and traditional analysis of liability, damages, and settlement options, use of evidence from the mediation in subsequent civil proceedings might be less vulnerable to criticism for being unfair and unreliable.

**38.** I found the descriptions in Rinaker's briefs of her mediation process articulate and instructive. *See, Rinaker*, 62 Cal.App.4th at 170 and 166, 74 Cal.Rptr.2d 464 (quotations from Ms. Rinaker's briefs).

It is important to acknowledge, however, that there is a broad range of approaches to mediation (people attach the label "mediation" to many different kinds of processes and methods)—and that the "mediations" that occur in at least some federal court ADR programs are likely to be quite a bit more "evaluative" than the purely facilitative model would contemplate. In fact, I suspect that in a good many "mediations" of cases filed in federal court, the parties and the neutral pay considerable attention to evidence and law—and that the negotiations revolve around fairly traditional analysis of positions—as much as the mediators might want to shift focus to underlying interests and to searches for creative solutions.

Regardless of which approach or methods the mediator used, however, the kind of testimony sought from the mediator in this case poses less of a threat to fairness and reliability values than the kind of testimony that was sought from the mediator in *Rinaker*. During the first stage balancing analysis in the case at bar, the parties and I assumed that the testimony from the mediator that would be most consequential would focus not primarily on what Ms. Olam said during the mediation, but on how she acted and the mediator's perceptions of her physical, emotional, and mental condition. The purpose would not be to nail down and dissect her specific words, but to assess at a more general and impressionistic level her condition and capacities. That purpose might be achieved with relatively little disclosure of the content of her confidential communications. As conceded above, that does not mean that compelling the testimony by the mediator would pose no threat to values underlying the privileges—but that the degree of harm to those values would not be as great as it would be if the testimony was for the kinds of impeachment purposes that were proffered in *Rinaker*. And in a balancing analysis, probable degree of harm is an important consideration.

What we have been doing in the preceding paragraphs is attempting, as the first component of the first stage balancing analysis, to identify the interests that might be threatened by ordering the mediator, in the specific circumstances presented here, to testify under seal—and to assess the magnitude of the harm that ordering the testimony would likely do to those interests. Having assayed these matters, we turn to the other side of the balance. We will identify the interests that ordering the testimony (under seal, at least initially) might advance, assess the relative importance of those interests, and try to predict the magnitude of the contribution to achieving those interests that ordering the testimony would likely make (or the extent of the harm that we likely would do to those interests if we did not compel the testimony).

The interests that are likely to be advanced by compelling the mediator to testify in this case are of considerable importance. Moreover, as we shall see, some of those interests parallel and reinforce the objectives the legislature sought to advance by providing for confidentiality in mediation.

The first interest we identify is the interest in doing justice. Here is what we mean. For reasons described below, the mediator is positioned in this case to offer what could be crucial, certainly very probative, evidence about the central factual issues in this matter. There is a strong possibility that his testimony will greatly improve the court's ability to determine reliably what the pertinent historical facts actually were. Establishing reliably what the facts were is critical to doing justice (here, justice means this: applying the law correctly to the real historical facts). It is the fundamental duty of a public court in our society to do justice—to resolve disputes in accordance with the law when the parties don't. Confidence in our system of justice as a whole, in our government as a whole, turns in no small measure on confidence in the courts' ability to do justice in individual cases. So doing justice in individual cases is an interest of considerable magnitude.

When we put case-specific flesh on these abstract bones, we see that "doing justice" implicates interests of considerable importance to the parties—all of whom want the mediator to testify. From the plaintiff's perspective, the interests that the defendants' motion threatens could hardly be more fundamental. According to Ms. Olam, the mediation process was fundamentally unfair to her—and resulted in an apparent agreement whose terms are literally unconscionable and whose enforcement would render her homeless and virtually destitute. To her, doing justice in this setting means protecting her from these fundamental wrongs.

From the defendants' perspective, doing justice in this case means, among other

things, bringing to a lawful close disputes with Ms. Olam that have been on-going for about seven years—disputes that the defendants' believe have cost them, without justification, at least scores of thousands of dollars. The defendants believe that Ms. Olam has breached no fewer than three separate contractual commitments with them (not counting the agreement reached at the end of the mediation)—and that those breaches are the product of a calculated effort not only to avoid meeting legitimate obligations, but also to make unfair use, for years, of the defendants' money.

Defendants also believe that Ms. Olam has abused over the years several of her own counsel—as well as the judicial process and this court's ADR program (for which she has been charged nothing). Through their motion, the defendants ask the court to affirm that they acquired legal rights through the settlement agreement that the mediation produced. They also ask the court to enforce those rights, and thus to enable the defendants to avoid the burdens, expense, delay, and risks of going to trial in this matter. These also are matters of consequence.

And they are not the only interests that could be advanced by compelling the mediator to testify. According to the defendants' pre-hearing proffers, the mediator's testimony would establish clearly that the mediation process was fair and that the plaintiff's consent to the settlement agreement was legally viable. Thus the mediator's testimony, according to the defendants, would re-assure the community and the court about the integrity of the mediation process that the court sponsored.

That testimony also would provide the court with the evidentiary confidence it needs to enforce the agreement. A publicly announced decision to enforce the settlement would, in turn, encourage parties who want to try to settle their cases to use

the court's mediation program for that purpose. An order appropriately enforcing an agreement reached through the mediation also would encourage parties in the future to take mediations seriously, to understand that they represent real opportunities to reach closure and avoid trial, and to attend carefully to terms of agreements proposed in mediations. In these important ways, taking testimony from the mediator could strengthen the mediation program.

In sharp contrast, refusing to compel the mediator to testify might well deprive the court of the evidence it needs to rule reliably on the plaintiff's contentions—and thus might either cause the court to impose an unjust outcome on the plaintiff or disable the court from enforcing the settlement. In this setting, refusing to compel testimony from the mediator might end up being tantamount to denying the motion to enforce the agreement—because a crucial source of evidence about the plaintiff's condition and capacities would be missing.[39] Following that course, defendants suggest, would do considerable harm not only to the court's mediation program but also to fundamental fairness. If parties believed that courts routinely would refuse to compel mediators to testify, and that the absence of evidence from mediators would enhance the viability of a contention that apparent consent to a settlement contract was not legally viable, cynical parties would be encouraged either to try to escape commitments they made during mediations or to use threats of such escapes to try to renegotiate, after the mediation, more favorable terms—terms that they never would have been able to secure without this artificial and unfair leverage.

In sum, it is clear that refusing even to determine what the mediator's testimony would be, in the circumstances here presented, threatens values of great signifi-

---

**39.** This argument may be based in part on the assumption that the burden of persuasion would be on the defendants, as the moving parties. In many settings that assumption would be correct—but for reasons set forth in a subsequent section of the text, we have concluded that the burden of persuasion in the specific circumstances of this matter should be placed on the plaintiff.

cance. But we would miss the main analytical chance if all we did was identify those values and proclaim their importance. In fact, when the values implicated are obviously of great moment, there is a danger that the process of identifying them will generate unjustified momentum toward a conclusion that exaggerates the weight on this side of the scale. Thus we emphasize that the central question is not which values are implicated, but how much they would be advanced by compelling the testimony or how much they would be harmed by not compelling it.

We concluded, after analysis and before the hearing, that the mediator's testimony was sufficiently likely to make substantial contributions toward achieving the ends described above to justify compelling an exploration, under seal, of what his testimony would be. While we did not assume that there were no pressures or motivations that might affect the reliability of the mediator's testimony,[40] it was obvious that the mediator was the only source of presumptively disinterested, neutral evidence. The only other witnesses with personal knowledge of the plaintiff's condition at the mediation were the parties and their lawyers—none of whom were disinterested. And given the foreseeable testimony about the way the mediation was structured (with lots of caucusing by the mediator. with one side at a time), it was likely that the mediator would have had much more exposure to the plaintiff over the course of the lengthy mediation than any other witness save her lawyer.

But it also was foreseeable that substantial questions would be raised about the reliability of the testimony that Ms. Olam's former lawyer, Phyllis Voisenat, would give. We knew, when we conducted this first stage balancing, that Ms. Voisenat no longer represented Ms. Olam. We also knew that strains had developed in that relationship before it had ended, and that lawyer and client had felt that their ability to communicate with one another left a great deal to be desired. Moreover, Ms.

Olam had suggested through her new lawyer (the fifth attorney to work with her in connection with her disputes with the defendants) that she might contend during the hearing that Ms. Voisenat, her former lawyer, had been one of the sources of unlawful pressure on her to sign the settlement agreement at the end of the mediation. And there were at least rumblings from the plaintiff's camp about a malpractice suit by Ms. Olam against Ms. Voisenat, who, understandably, expressed concerns about the possible use against her in such litigation of testimony she would give .in these proceedings. For all these reasons, there was a substantial likelihood that plaintiff would raise serious questions about the accuracy of Ms. Voisenat's testimony and that, given all the circumstances, the court would not be sure how much it should rely on the evidence Ms. Voisenat would give.

We also could foresee that the circumstances in which the mediator would have interacted with Ms. Olam during the mediation held the promise of yielding perceptions of her mental, emotional and physical condition that would be especially well-grounded. Because we know how the court's mediators are trained, we could anticipate that Mr. Herman met with the plaintiff and her lawyer in private, away from the defendants and their counsel—thus freeing plaintiff from the emotional charges, defensiveness, stress, and 'pressure to posture' that negotiating in the presence of 'the enemy' can inspire. We also could expect (because we know how Mr. Herman trains other people to act as mediators) that in his private meetings with plaintiff and her lawyer Mr. Herman would try to create an environment that was as unthreatening and as comfortable for her as possible. And that environment would likely give him more reliable access to the plaintiff's real condition than any of the witnesses connected with the defense of the case could have had.

In short, there was a substantial likelihood that testimony from the mediator

---

**40.** *See,* footnote 22, *supra.*

would be the most reliable and probative on the central issues raised by the plaintiff in response to the defendants' motion. And there was no likely alternative source of evidence on these issues that would be of comparable probative utility. So it appeared that testimony from the mediator would be crucial to the court's capacity to do its job—and that refusing to compel that testimony posed a serious threat to every value identified above. In this setting, California courts clearly would conclude the first stage balancing analysis by ordering the mediator to testify *in camera* or under seal—so that the court, aided by inputs from the parties, could make a refined and reliable judgment about whether to use that testimony to help resolve the substantive issues raised by the pending motion.

As noted earlier, we called the mediator to testify (under seal) after all other participants in the mediation had been examined and cross-examined—so that the lawyers (and the court) would be able to identify all the subjects and questions that they should cover with the mediator. With the record thus fully developed, we were well situated to determine whether using (and publicly disclosing) the mediator's testimony [41] would make a contribution of sufficient magnitude to justify the level of harm that using and disclosing the testimony would likely cause, in the circumstances of this case,[42] to the interests that inform the mediation privilege law in California. As our detailed account, later in this opinion, of the evidence from all sources demonstrates, it became clear that the mediator's testimony was essential to doing justice here—so we decided to use it and unseal it.

## THE EVIDENTIARY HEARING

The court held the evidentiary hearing on August 23rd and 24th, 1999. We heard testimony and considered documentary evidence about Ms. Olam's medical conditions, the events of September 9–10, 1998, and various post-mediation events related to the purported settlement.[43] *See*, E.H. Transcript. All the participants in the mediation testified, as did the physician who was treating plaintiff during the pertinent period. We took Mr. Herman's testimony under seal.

At the conclusion of the evidentiary hearing, the court took defendants' Motion to Enforce under submission. We explain below the basis for our decision to GRANT the motion.

## PLAINTIFF'S CONSENT TO THE SEPTEMBER 9–10, 1998 SETTLEMENT MEMORIALIZED BY THE MEMORANDUM OF UNDERSTANDING WAS NOT THE RESULT OF "UNDUE INFLUENCE"

### I. Burden of Proof

■ While the defendants are the moving parties here, it appears that under California law the burden of proving a claim of "undue influence" is on the claimant (here, Ms. Olam) when there is no confidential relationship between the con-

---

41. In some circumstances, it might be appropriate for courts to use and disclose only part of the testimony a mediator gave (or would give)—and to leave the remainder under seal (or undisclosed after the *in camera* review of what the testimony would be). That course was not appropriate in the case at bar—as virtually all the testimony the mediator gave was pertinent and probative. Whether parsing and protecting from disclosure some of a mediator's testimony would contribute appreciably to advancing interests underlying the California mediation privileges is not clear.

42. To repeat, one important component of those circumstances is the fact that all the

parties to the mediation wanted the court to compel and to consider the mediator's testimony.

43. "It is well settled that a district court has the equitable power to enforce summarily an agreement to settle a case pending before it." *Callie v. Near*, 829 F.2d 888, 890 (1987). "Where material facts concerning the existence or terms of an agreement to settle are in dispute, the parties must be allowed an evidentiary hearing." *Id.* The parties do not challenge this court's jurisdiction to conduct the August evidentiary hearing or to decide defendants' Motion to Enforce.

tracting parties. *See, e.g., Dorn v. Pichinino,* 105 Cal.App.2d 796, 801, 234 P.2d 307 (1st Dist.1951). There was no confidential or fiduciary relationship between the parties during the settlement negotiations that produced the agreement that defendants seek to enforce.

■ Moreover, for the following reasons, the court holds that defendants have set forth the equivalent of a *prima facie* case that, on September 9–10, 1998, the parties entered a valid, enforceable contract.

The following facts are not disputed. The September 1998 mediation produced a typed document that set forth clearly apparent settlement terms. Plaintiff signed that document, as did the lawyer who had been representing her during the mediation and for many months before it. That document (the MOU) expressly states that it "is intended as a binding document itself." *See,* Ex. D–3. The mediation was conducted under the auspices of a court-sponsored ADR program by a mediator who is a member of the court's staff. The mediator, apparently believing that the case had fully settled, filed a certificate in which he represented as much to the court. *See,* Certification of ADR Session, filed October 5, 1998. On September 10, 1998, counsel for Ms. Olam and counsel for the defendants confirmed, unequivocally and on the record, that the parties had reached a settlement, that all essential terms had been agreed to, and, therefore,

that the trial date should be vacated. *See,* Transcript· September 10, 1999 Status Conference, WDB Tape No. C98–062.

Under these circumstances, when a party to the apparent contract seeks to escape its obligations on a claim of undue influence, that party must bear the burden of persuasion. Thus the law places the risk of non-persuasion on Ms. Olam.

## II. *The Legal Basis For Plaintiff's Claim of Undue Influence*

By asserting undue influence as a defense to defendants' Motion to Enforce, plaintiff seeks rescission of the settlement agreement under § 1689(b)(1) and § 1575 of the California Civil Code. *See,* Plaintiff's Brief Concerning California Law Applicable to Purported Settlement Agreement, filed July 26, 1999.

Civil Code § 1689(b)(1) provides:

A party to a contract may rescind the contract in the following cases: (1) If the consent of the party rescinding ... was ... obtained through ... undue influence, exercised by or with the connivance of the party as to whom he rescinds.

Under pertinent California law, "[u]ndue influence consists ... (2) In taking an unfair advantage of another's weakness of mind; or (3) In taking a grossly oppressive and unfair advantage of another's necessities or distress." Cal. Civil Code § 1575.[44]

■ Despite an ambiguous sentence or two in the cases,[45] we conclude

---

**44.** California Civil Code §§ 1567(4) and 1568 also relate to plaintiff's claim that "undue · influence" vitiates apparent consent. "An apparent consent is not real or free when obtained through: ... Undue influence." Cal. Civil Code § 1567(4). "Consent is deemed to have been obtained through one of the causes mentioned in the last section only when it would not have been given had such cause not existed." Cal. Civil Code § 1568.

**45.** "Whether from weakness on one side, or strength on the other, or a combination of the two, undue influence occurs whenever there results 'that kind of influence or supremacy of one mind over another by which that other is prevented from acting according to his own

wish or judgment' ... Whether a person of subnormal capacities has been subjected to ordinary force or a person of normal capacities subjected to extraordinary force the match is equally out of balance." *Odorizzi,* 246 Cal.App.2d at 132, 54 Cal.Rptr. 533.

This statement cannot be fairly understood out of context. The dicta just cited is contradicted by language from the same opinion that clearly states that undue influence arises out of the combination of the two elements. *Odorizzi,* 246 Cal.App.2d at 131, 54 Cal.Rptr. 533. Moreover, this court has not found any case in which undue influence was found based on the presence of only one of the two elements. *See, Johnson v. I.B.M., Corp.,* 891 F.Supp. 522 (N.D.Cal.1995) ("minimally

that under California law a party cannot successfully invoke the doctrine of "undue influence" to escape an apparent contract unless that party proves two things: (1) that she had a lessened capacity to make a free contract and (2) that the other party [46] applied its excessive strength to her to secure her agreement. *Odorizzi v. Bloomfield School Dist.*, 246 Cal.App.2d 123, 54 Cal.Rptr. 533 (2d Dist.1966). "In combination, the elements of undue susceptibility in the servient person and excessive pressure by the dominating person make the latter's influence undue." [47] *Id.*

There is no precise formula of factors that, when applied, will identify for the court whether undue influence has occurred. The court should consider whether—in light of the entire context—there is a "supremacy of one mind over another by which that other is prevented from acting according to his own wish or judgment, and whereby the will of the person is overborne and he is induced to do or forbear to do an act which he would not do, or would do, if left to act freely." *Webb v. Saunders*, 79 Cal.App.2d 863, 871, 181 P.2d 43 (4th Dist.1947).

Although the court must make its determination based on its assessment of all the circumstances, California courts have identified various indicia of undue weakness and of undue pressure.

## Undue susceptibility

According to California authorities, courts should consider the following factors, among others, when determining whether plaintiff was in an unduly weakened condition at the time she agreed to the terms of the MOU: lack of full vigor due to age, physical condition, physical exhaustion, and emotional anguish. *Odorizzi*, 246 Cal.App.2d at 131, 54 Cal.Rptr. 533; *Wells Fargo Bank & Union Trust Co. v. Brady*, 116 Cal.App.2d 381, 254 P.2d 71 (1st Dist.1953); *Shaffer v. Security Trust & Savings Bank*, 4 Cal.App.2d 707, 41 P.2d 948 (4th Dist.1935); *Weger v. Rocha*, 138 Cal.App. 109, 32 P.2d 417 (3d Dist.1934); *Keithley v. Civil Service Board of City of Oakland*, 11 Cal.App.3d 443, 89 Cal.Rptr. 809 (1st Dist.1970); *Moore v. Moore*, 56 Cal. 89 (1880).

The presence of any one or more of these factors may support—but does not necessitate—a finding of undue susceptibility. Moreover, "[a]s a general rule, age, physical condition, and suffering of pain furnish no basis for setting aside a conveyance if the [party seeking rescission] exercised a free and untrammeled mind." *Anderson v. Nelson*, 83 Cal.App. 1, 5, 256 P. 294 (2d Dist.1927); *Webb*, 79 Cal.App.2d at 872, 181 P.2d 43. *See also, Nessen v. Nessen*, 218 Cal. 59, 21 P.2d 415 (1933) ("fact that the grantor was seventy-five

heightened susceptibility" did not establish undue influence where there was no evidence of overpersuasion); *Smalley v. Baker*, 262 Cal. App.2d 824, 69 Cal.Rptr. 521(1st Dist.1968) *abrogated as to different issue* (court need not decide whether manic-depressive disorder constitutes undue susceptibility where there was no evidence that defendant knew of plaintiff's illness or otherwise took advantage of plaintiff); *see also, Webb v. Saunders*, 79 Cal.App.2d 863, 181 P.2d 43 (4th Dist.1947).

46. At some point Ms. Olam appeared to suggest that the source of the "undue influence" that she allegedly suffered was her own lawyer at the mediation, Phyllis Voisenat. We know of no California authority for the notion that the requirements of the doctrine of undue influence can be satisfied by a showing that a party's lawyer pressured her into signing the contract. We decline to expand California

law to embrace any such theory. The law provides other vehicles for relief when a party's own lawyer is the source of the misconduct.

We also note that the evidence adduced at the hearing would not support a finding of fact that Ms. Voisenat pressured (unduly or otherwise) Ms. Olam to sign the MOU.

47. Plaintiff argues that there is a hydraulic relationship between the elements, for example, substantial evidence of undue susceptibility may support a finding of undue influence even where there is only minimal evidence of undue pressure. The court need not resolve whether and under what circumstances such a hydraulic relationship permits a finding of undue influence because—as discussed *infra*—plaintiff has proffered *no* evidence of undue pressure by defendants or their counsel.

**1142**

years of age and at times endured pain, sleeplessness, and other effects of her malady and her age, even though coupled with moments of forgetfulness and a natural trait of being easily swayed ... does not without more sustain the plaintiff's contentions").

### Undue pressure

■ Excessive pressure need not involve misrepresentation or the threat of force. *Odorizzi*, 246 Cal.App.2d at 130, 54 Cal.Rptr. 533. The following factors may indicate that plaintiff was subjected to excessive persuasion: (1) discussion of the transaction at an unusual or inappropriate time, (2) consummation of the transaction in an unusual place, (3) insistent demand that the business be finished at once, (4) extreme emphasis on the untoward consequences of delay, (5) use of multiple persuaders by the dominant side against a servient party, (6) absence of third-party advisors to the servient party, and (7) statements that there is no time to consult financial advisers or attorneys. *Odorizzi*, 246 Cal.App.2d at 133, 54 Cal.Rptr. 533; *Keithley*, 11 Cal.App.3d at 452, 89 Cal. Rptr. 809.

As previously stated, the court considers the presence or absence of each of the above factors in light of all the circumstances.

### III. *Ms. Olam's Testimony About September 9–10, 1998*

Ms. Olam testified as follows.[48]

■ On September 9, 1998, she woke up at 4:35 a.m. When she awoke she had a severe headache and felt very weak all over her body. Ms. Olam took only Excedrin Formula for headaches. In September of 1998, she regularly took the following prescription medications: prilo-

sec for an intestinal condition, donnatal for intestinal pain, and verapamil for blood pressure. But on September 9, 1998, she took only verapamil—and she did not take that until around noon.

According to plaintiff, Ms. Voisenat never explained to her client what would occur at the mediation.[49] The mediation began around 9:00–10:00 a.m. on September 9, 1998. No one spoke to plaintiff or in her presence at the start of the mediation. She had no understanding of how the mediation would proceed. Ms. Olam testified that she was left alone in a room sitting at a conference table while all the other mediation participants conversed in a nearby room. During the morning of September 9, 1998, participants would go in and out of the room where she was sitting alone. She does not remember any of them saying anything to her.

Around lunch time Ms. Olam was given a lunch break that was announced by "the judge." Ms. Olam did not recall who the "judge" was but testified that it was not Mr. Herman. Ms. Olam ate lunch in the building cafeteria with Ms. Voisenat. Ms. Olam described her relationship with her attorney as "totally broken down" and testified that she was afraid to ask Ms. Voisenat any questions about what was happening. According to plaintiff, she and Ms. Voisenat sat in silence except maybe for some "comment on the food."

At some point during the afternoon Mr. Herman spoke to Ms. Olam. It is plaintiff's recollection he told her that if she went to trial and lost she would lose both her homes and be unable to get them back. She claims that this point was "accented" by Mr. Herman and Ms. Voisenat during the afternoon. Ms. Olam testified that she was "upset" at the prospect of losing both of her homes.

48. The facts described herein are as testified to by Ms. Olam. E.H. Transcript WDB Tape No. 1. The court relates Ms. Olam's testimony here *without* yet making any findings about its accuracy or judgments about the impact of such testimony on plaintiff's claim for undue influence. The court will discuss the relevant testimony of other witnesses and make find-

ings of fact about the September 9–10, 1998 mediation in section IV below.

49. Ms. Olam also testified that she did not understand that the mediation was voluntary, but that she also did not have an understanding that she was required to participate.

According to Ms. Olam, she did not participate in *any* negotiations. At no time during the afternoon did any mediation participant present a settlement offer to her, and she denies making any such offers.

Ms. Olam also testified that, over the course of the afternoon, her physical condition worsened until around 6:00 p.m., at which time, she felt very weak, was in extreme pain, felt dizzy, and felt like passing out. Ms. Olam did not tell anyone about her physical condition because, she explained, it is "not [her] nature to complain," she was "afraid," she "was under pressure," and she "didn't think [she] had any right to say."

According to plaintiff, there were no discussions about whether to break for dinner. Around 6:00–7:00 p.m. she got up and consumed a cookie and coffee from the snack bar. She did not have any understanding of how much longer the mediation would continue. She did not ask when the session would end because she did not know that she would be "allowed" to ask questions.

Ms. Olam stated that after she returned from the snack bar she again sat alone at the conference table. She does not recall anyone talking to her about a possible settlement or examining any written materials between the time she ate the cookie and roughly midnight. Similarly, she does not recall saying anything to anyone else about settlement.

According to Ms. Olam's testimony, during the evening of September 9, 1998, she was in "considerable pain . . . all over [her] head, down [her] neck, and [her] left arm, . . . [and] had pain in her stomach." In addition, she claims that she felt 'weak all over.' She stated that she thinks she passed out a couple of times at the table. No one asked Ms. Olam about her condition and, she says, she told no one about it because she felt she was not supposed to say anything.

The session ended around midnight when the other participants came out of the nearby room together. Based on their mannerisms, Ms. Olam perceived that everyone seemed very "hurried."

Someone put some paper work on the table in front of her.[50] Ms. Olam felt very weak and "about ready to pass out." According to plaintiff, she could not read the paper because her eyes were watering and her stomach pain was extreme. She testified that her medical conditions would have affected her ability to think clearly at 1:00 a.m.—but that her medications did not affect her mentally.

On cross-examination, plaintiff told Mr. Stea that she did not read *any* of the numbered "terms" in the MOU and that *none* were explained to her. Plaintiff also denied discussing or negotiating terms 3, 4, 5, and 6 of the MOU. In fact, Ms. Olam stated unequivocally: "I never negotiated at any time during the mediation" and "I was not present at any negotiations."

She asserted on the stand that she was told that the paper that was put in front of her on the table was an agreement and that it was to her advantage to sign or she could lose both her homes. At the time she signed the paper, she had a vague idea that she probably would lose one of the homes but she had no idea what would happen to her mortgage.

Plaintiff signed the MOU. Although she could not read the MOU and did not understand it, she felt pressured to sign it because she was "very ill," "an older woman," and "all alone" and because she was not familiar with the mediation process and her relationship with her attorney was "totally broken down." She said she did not even consider declining to sign the paper because she did not think she was allowed to say anything; she did not "think [she] was involved in what was going on."

She also testified that when the document (MOU) was presented to her she

---

**50.** The parties do not dispute that the paper was the "MOU."

looked at Ms. Voisenat, who half-nodded at her. Plaintiff interpreted her attorney's nod as an indication that Ms. Olam should sign the paper. Ms. Olam testified that she signed the paper because her attorney "urged" her to and because she would lose her homes if she did not sign.

After the parties signed the paper, Mr. Herman drove Ms. Olam and Ms. Voisenat home.

Ms. Olam testified that neither Mr. Gaddis, Mr. Hulme, or Mr. Stea *ever* said anything to her during the mediation. She had no conversation with them. None of them was in the room with her during the day. At the end of the evening, when she signed the document, the defendants were in the room with her, but they were never closer than 4–5 feet away. Neither defendants nor their counsel ever physically threatened her. She testified, however, that she felt pressured because they all seemed so "hurried."

If this version of the facts were accurate, Ms. Olam clearly would have satisfied the first of the two necessary elements of the doctrine of "undue influence" under California law. For reasons we explain in the next sections, however, we have concluded, after considering all the evidence, that Ms. Olam's version of events at the mediation bears little resemblance to the real historical facts. Moreover, her version, even if true, would fall short of satisfying the second essential element of the test for "undue influence."

## IV. *Did Ms. Olam Prove That Her Consent to the MOU Was Obtained As A Result of Undue Influence?*

### A. *Was Ms. Olam rendered unduly susceptible by physical and emotional distress?*

It is undisputed that Ms. Olam was 65 years old at the time the mediation took place. It also is undisputed that the mediation lasted for more than 12 hours and that all participants were tired (and, presumably, hungry) when the process finally came to a close sometime between midnight and 1:00 a.m. on September 10, 1998. Nor do defendants contend that Ms. Olam did not suffer, at least at some times in the summer and fall of 1998, from high blood pressure, headaches, and abdominal pains. And no one quarrels with the notion that the interests of Ms. Olam's that were at stake in the litigation and the negotiations were of considerable importance to her. So, in some measure, the situation was inherently stressful—and would have been so experienced by almost anyone. But these facts fall far short, as a matter of law, of establishing the "undue susceptibility" that plaintiff must prove to satisfy the first element of the two part test for undue influence. That element would be satisfied only if she proved that she was in fact suffering the acute distress that she described on the stand. When we consider all of the evidence, and the accompanying indicia of credibility, we find that Ms. Olam's testimony about the severity of her condition was implausible and inaccurate— leaving no factual basis for a finding that she was unduly susceptible at any point during the mediation or at the time she signed the MOU.

The only testimony that tended in any noteworthy measure to corroborate Ms. Olam's extreme version of the pertinent facts was offered by the doctor whom she had been seeing at the time, Dr. Serrhan. But even his testimony raised questions about the accuracy of Ms. Olam's version of history.

Dr. Serrhan confirmed that, in September of 1998, plaintiff suffered generally from (1) headaches,[51] (2) high blood pressure, and (3) abdominal pain.[52] Dr. Serrhan recalled that plaintiff complained of

---

51. However, according to Dr. Serrhan, plaintiff's headaches could not be classified as either "classic" or "common" migraines.

52. Dr. Serrhan also testified that although the time of day at which plaintiff takes prilosec is not critical, failing to take it all day until after midnight might affect her abdominal pain.

body weakness and described her pain as at times incapacitating. He also verified that plaintiff had prescriptions for verapamil, donnatal, and omperazole (prilosec), and that she purported to self-treat with Excedrin.

However, Dr. Serrhan also testified (1) that he did not see plaintiff at any time between July 31, 1998 and October 9, 1998, and (2) that he had no basis for believing that plaintiff communicated anything to him about her physical or mental condition during the month following the mediation. Nor did Ms. Olam claim that she sought any medical advice or treatment in the period immediately following the mediation. That fact undermines the credulity of her claim that she was in acute physical and emotional distress during the mediation and when she signed the MOU.

All the other testimony bearing on Ms. Olam's condition tends to contradict her claim that she was in acute distress.

Although Ms. Voisenat and Mr. Herman were aware that Ms. Olam was tired and hungry at the end of the evening—they, and Messrs. Stea, Gaddis, and Hulme each testified that, on September 9–10, 1998, plaintiff did not appear to be suffering from any physical maladies or to be suffering from any undue emotional distress.[53] Ms. Voisenat testified that Mr. Herman "constantly checked with [plaintiff] on her state, on how she was feeling, reminding her it's just mediation she doesn't have to go forward. He was very thorough with checking with her at each step of the mediation." According to Ms. Voisenat, Ms. Olam communicated that she wanted to keep going.[54]

In addition, Ms. Voisenat stated that, over the course of their relationship, plaintiff "was very frank to me" about her medical symptoms and that Ms. Voisenat had canceled legal proceedings in this action on prior occasions when Ms. Olam complained that she was suffering from a physical ailment. This testimony undermines plaintiff's contentions that she did not tell anyone how sick she felt because she was afraid—and suggests that the reason she did not tell anyone during the mediation that she was in severe pain is that she was not experiencing any such pain.

The unchallenged evidence about how Ms. Olam acted on the drive home after the mediation also undermines the credibility of her claim about her condition during the session. Appreciating that the lateness of the hour would make it difficult to find transportation, Mr. Herman offered to drive plaintiff and her lawyer home. When asked about Ms. Olam's condition and her behavior during that car ride, Ms. Voisenat and Mr. Herman testified, without contradiction, that Ms. Olam said nothing about any medical or emotional condition, did not complain about being in any kind of distress, expressed relief that the litigation had been brought to a close, and generally engaged in rather animated small talk. There is no evidence, even from her, that she displayed signs of confusion, that she seemed perplexed by any of the terms reached or unhappy in any way about the mediation process or how Mr. Herman had handled it, or that any aspect of her words or conduct signaled that she was suffering from anything but fatigue (as were all the participants in the process). These facts seem particularly telling—because this was a relaxed, unthreatening, looser environment—where

---

53. Although he was aware that Ms. Olam was tired by the end of the session, it was Mr. Herman's opinion that plaintiff was no more tired than any of the other participants. Mr. Herman observed that she did not become less talkative as the day progressed. In addition, during post-mediation meetings between Mr. Herman and Ms. Olam, she repeatedly told him she was tired at the mediation, but she never said that she was incapacitated or that she did not understand.

54. Ms. Voisenat testified that Ms. Olam did not express reservations about continuing negotiations until later in the evening when she was concerned that the buses would stop running and she would not be able to get home. Mr. Herman apparently indicated that he would drive her home.

Ms. Olam should have felt freer to communicate about anything that was troubling her.

Ms. Voisenat also testified that in the months following the mediation, as the parties and their counsel attempted to draft a more formal settlement agreement, Ms. Olam never told Ms. Voisenat that she was incoherent, medically ill, or under duress on the day of the mediation.

Mr. Herman also recalled that plaintiff cried at least once during the mediation and that "it's possible she was teary at other points in the mediation." He testified, however, that he did not find this "particularly noteworthy." Mr. Herman has conducted at least 100 mediations. In his experience, it is not unusual for people to cry during mediation. Moreover, he testified that Ms. Olam was not crying at the time she read or signed the MOU.

In assessing the persuasive power of Ms. Olam's testimony about the severity of her physical and emotional distress we also must take into account the plausibility of her testimony about other aspects of the mediation. For reasons we detail below, that testimony was in many important respects patently implausible and was flatly contradicted by appreciably more credible evidence from other sources. In the end, the court was quite confident that Ms. Olam's version of the facts was thoroughly unreliable. Because the only substantial support for her claim of undue susceptibility was her own testimony, it follows that that claim ended up having no legally meaningful support at all.

### The evidence indicates that Ms. Olam fully participated in the mediation

As described above, Ms. Olam claimed that she sat in a room, alone, all day, while the other mediation participants conversed in a nearby room. She said that she did not participate in *any* negotiations or propose any settlement offers, and no settlement offer was ever presented to her. As Ms. Olam recalls the day, no one spoke to her about what was happening—except to tell her that if she did not prevail at trial she would irrevocably lose both her homes. Shortly after midnight the other participants presented her with a document to sign, which she says she neither read nor understood.

Ms. Voisenat's and Mr. Herman's substantially more plausible testimony stand in stark contrast to plaintiff's characterization of the September 9–10, 1998 mediation.

Mr. Herman and Ms. Voisenat testified as follows.[55]

The mediation session began with all participants, including Ms. Olam, in one room.[56] Mr. Herman gave a general introduction about his role and how the mediation would proceed. Next, each party, in the presence of all the other participants, made a focused presentation of their view of the case and their position. This group session lasted roughly 45 minutes, perhaps an hour.

Following this initial collective session, Mr. Herman escorted defendants and their counsel into a nearby room, leaving Ms. Voisenat with Ms. Olam. Ms. Voisenat tes-

---

**55.** The following paragraphs set forth a description of Ms. Voisenat's and Mr. Herman's testimony about the mediation session. E.H. Transcript, WDB Tape No. 2 and 3. Unless otherwise stated, the court does not yet make any findings about what actually transpired on September 9–10, 1998.

For the sake of ease of writing, the following description is based primarily on Mr. Herman's version of events. We note, however, that Ms. Voisenat's testimony *substantially* corroborates Mr. Herman's characterization of the mediation. Ms. Voisenat's testimony is set forth explicitly where necessary to supple-

ment Mr. Herman's version of the events. The court found both Mr. Herman and Ms. Voisenat credible witnesses. Nonetheless, we rely primarily on Mr. Herman's testimony because—while Mr. Herman has no apparent biases—we are not unmindful that Ms. Voisenat may have a personal stake in her testimony. It is the court's understanding that plaintiff has threatened to sue Ms. Voisenat for malpractice.

**56.** Messrs. Stea, Gaddis, and Hulme also corroborated this testimony.

tified that she was present with Ms. Olam virtually the *entire* day.[57]

Mr. Herman promptly returned to "plaintiff's" room in order to conduct his first private caucus. "I spent that time trying to elicit Miss. Olam's concerns. I wanted her to have an opportunity to tell her story. I offered Miss Olam the opportunity to speak in the joint session when everyone was together as is my normal practice and she declined to do so. So, my first priority was to hear her story from her. So, mostly it was a narrative of what happened from her point of view and an explanation on her part as to the things she wanted most to achieve."

Mr. Herman spoke with plaintiff and her counsel for at least an hour, and Ms. Olam did a substantial amount of the talking. During this initial private caucus Ms. Voisenat participated very little.

After this substantial session with the plaintiff, Mr. Herman caucused with defendants. Then he returned to the plaintiff's room. It wasn't until this second private session with plaintiff and her lawyer that Mr. Herman began some discussion of the legal merits of plaintiff's case. It is Mr. Herman's recollection that this conversation primarily involved Ms. Voisenat, although Ms. Olam was present. According to Ms. Voisenat, Mr. Herman spent a substantial amount of time going over the October 1994 "release agreement"[58] and

potential resolutions of the case. Mr. Herman testified that while it is not his normal practice to express an opinion about the likelihood of success, he raised "pointed questions" and discussed the relative strengths and weaknesses of the case.

Mr. Herman testified that, after the second merits-related caucus, there was an "escalating" series of caucuses during which various settlement terms were being proposed and considered. Ms. Voisenat testified that Ms. Olam made the first settlement offer in the mid-afternoon. Moreover, each time Mr. Herman prepared to take a proposal to defendants he would summarize the proposal to plaintiff and reduce to writing what *she wanted* before taking it to defendants.[59]

Mr. Herman also testified that at some point during the mediation he began to suspect that the relationship between plaintiff and her counsel may have been less than perfect. As a result, he "made [his] very best effort to review more closely with the client herself, with Mrs. Olam herself, all of the terms that [they] were discussing and took on a more active role in working directly with her than [he] might otherwise have done had [he] perceived her lawyer filling this role."[60]

According to Mr. Herman, plaintiff was actively involved in negotiating the terms that eventually became paragraphs 1, 3, 4, 5, 6a, and 6b of the MOU.[61] In addition,

57. According to Ms. Voisenat, plaintiff was alone only when Ms. Voisenat used the restroom, around 5:00 p.m. when Ms. Voisenat made a phone call to arrange child care, and in the late evening when Ms. Voisenat, and Messrs. Stea and Herman were in Mr. Herman's office drafting the MOU.

58. Ex. D–2. The October 1994 "extension agreement" contained a term purportedly releasing defendants from all liability in connection with the 1992 loan.

59. "It was her proposal that Mr. Herman was reducing to writing to make sure he understood what she wanted and that this was going to fulfill what she wanted." "A lot of time was consumed by Ms. Olam explaining to Mr. Herman over and over her concerns related to each provision."

60. Ms. Voisenat testified that between lunch and 6:00 p.m. Mr. Herman spent approximately 85% of the afternoon with her and plaintiff—"predominantly speaking with Ms. Olam."

61. Term number 1 provides for the non-judicial foreclosure of plaintiff's Naples Property.

Term number 2 establishes defendants' opening bid on the Naples Property.

Term number 3 provides for the manner in which defendants are to notice the foreclosure sale and provides limitations on the dissemination of information about the foreclosure within Congress Mortgage.

Term number 4 appears to provide plaintiff a right of first refusal in the event Congress Mortgage sells the Naples Property.

Mr. Herman specifically recalls discussing what became terms number 7 and 8, with plaintiff.[62]

Mr. Herman's testimony on these matters was quite specific—increasing its plausibility. For example, he stated that it was Ms. Olam who raised the concept of what became term number 4. She stated that if she came into a windfall she wanted the option of re-purchasing the Naples property. This term was "inserted at her personal request." Similarly, the mediator detailed Ms. Olam's participation in the negotiations over what became paragraphs 6a and 6b. Because she did not want to remain responsible to Congress Mortgage, Ms. Olam and her counsel proposed an alternative under which Ms. Olam would attempt to obtain a loan from an alternate source to pay off her remaining debt to Congress Mortgage.[63] Term number 6b was created in the event that Ms. Olam could not secure that alternate funding. According to Mr. Herman, plaintiff initially "overestimated" the amount of money she could pay monthly under term 6b. He and Ms. Voisenat talked at length with plaintiff to suggest a realistic monthly payment.

Ms. Olam has made much in these proceedings of the fact that she cannot afford the maximum monthly payment set forth in the graduated payment plan described in term 6b. Plaintiff suggests that, in light of her limited income, she could not have freely consented to such a term. However, Mr. Herman testified that he, Ms. Olam and Ms. Voisenat "discussed openly" this problem and tried to generate ideas

about how to deal with it. The ideas they considered included getting a loan from another source, taking in a boarder, or seeking income through employment.[64] Moreover, the question during settlement negotiations for many litigants is not whether proposed terms are good, but how they compare to the likely alternatives. It can be quite rational to accept even difficult terms rather than risk losing everything at trial.

Mr. Herman informed plaintiff that term number 8 was a fundamental component of the settlement. "She did affirm to [him] that she understood the idea that if this agreement were signed her case would be dismissed, and this would be over." Mr. Herman also discussed with plaintiff the idea that any agreement signed that evening would be intended to be a binding contract—even though the lawyers would later draft a more formal agreement.

Ms. Voisenat believed that the parties actually had an understanding by early or mid-afternoon that a settlement would be reached—but that determining how to structure it turned out to be a substantial challenge. It wasn't until sometime between 10:00 and 11:00 p.m. that Mr. Herman was confident that the parties had agreed to all the essential terms. At that juncture he, Mr. Stea, and Ms. Voisenat adjourned to his office (in the courthouse) to type the MOU. As counsel had some difficulty agreeing on specific wording, the process of memorializing the agreement took longer than expected. Mr. Herman testified unequivocally, however, that the

---

Term number 5 provides that plaintiff shall vacate the Naples property by November 16, 1998.

Term number 6 provides that plaintiff will retain the Athens Property and provides two means for paying the remainder of the debt plaintiff owes Congress Mortgage.

Term number 7 provides for mutual general releases between the parties.

Term number 8 provides that plaintiff will dismiss all of her claims with prejudice.

Term number 9 purports to confer on this court continuing jurisdiction over enforcement of the MOU and ultimate formal settlement agreement.

**62.** Ms. Voisenat testified that Mr. Herman discussed the terms with plaintiff one by one. "Each term was her's."

**63.** This represents term number 6a. Ms. Voisenat testified that this term was developed from a plan that she and plaintiff had discussed previously in connection with the *Mann* litigation.

**64.** Ms. Voisenat also testified that the graduated aspect of the payment plan was created in response to plaintiff's expressed concerns that she couldn't afford to pay nearly $1000 per month while in the process of moving out of the Naples Property.

substantive terms in the MOU as he finally typed it "absolutely" were the same as the substantive terms that he had explained to plaintiff and to which she had agreed before he began the typing process.

Mr. Herman testified that after the typing was completed he gave a copy of the MOU to defendants and he and Ms. Voisenat presented a copy to plaintiff. Plaintiff appeared to read the document. Mr. Herman stated, "[i]n the context of the entire day, it was inconceivable to me that she could be doing anything but reading the document closely. This had been a mediation in which Mrs. Olam was engaged in active conversation with me throughout the process—where we went over point by point, term by term, repeatedly."

Defendants and their counsel signed their copy of the MOU. Mr. Herman wanted all the participants to sign one copy of the document. After plaintiff read her copy Mr. Herman asked whether she was ready to sign. She indicated that she was ready to sign the MOU.[65] Mr. Herman went into defendants' room and retrieved their signed copy. Plaintiff then signed that document, as did Ms. Voisenat.

**65.** Although he does not recall her exact words, Mr. Herman's best recollection is that she verbally indicated her consent to the document. He believes she communicated something to the effect that she was ready to sign the document. This communication led Mr. Herman to go into defendants' room to obtain the copy they had signed.

**66.** Ms. Olam also testified that she did not understand the mediation process or her role in it. The court FINDS that it is more probable than not that plaintiff understood the mediation process, her role in it, and the voluntary nature of the process.

The evidence supports a finding that at the start of the mediation Mr. Herman explained the process to all participants, including Ms. Olam. In addition, he stated that it is his standard practice to ask participants if they have any questions. His recollection is that no one had questions. Ms. Voisenat also testified that during the mediation Mr. Herman made it clear to plaintiff that she did not have to continue—she could take her case to trial.

Mr. Herman testified that he believed that, on September 9–10, 1998, Ms. Olam understood and agreed to the terms of the MOU. Ms. Voisenat also testified that plaintiff understood and agreed to all terms.

The court credits Mr. Herman's testimony, as corroborated substantially by Ms. Voisenat, about the extent of plaintiff's participation in the mediation. Unlike plaintiff, Mr. Herman has no personal stake in the outcome of this case. And unlike plaintiff he recalled detailed aspects of various conversations—and where he did not recall what transpired he frankly admitted that he could not remember. Given all the circumstances and evidence, as well as Mr. Herman's considerable experience as a mediator and a mediation teacher, the court finds patently implausible Ms. Olam's testimony that she was left alone all day, that she did not participate in any negotiations, that she was told virtually nothing, and that after 20 hours she was asked to sign a document that she neither read nor understood. Instead, I find that she participated actively throughout the process—with a "free and untrammeled mind"—and that she understood fully the terms of the MOU that she signed.[66]

The court also notes the following. In November 1995, plaintiff signed a statement representing that she had reviewed and discussed with her then-counsel—Ms. Lundberg—available court and private dispute resolution options. *See*, Certification of Discussion of ADR Options, filed November 16, 1995.

Plaintiff had been involved in settlement discussions in this case in December 1995. In December 1997 the court ordered Ms. Voisenat (then Rafter) to discuss mediation with her client and to inform Ms. Olam that she would not give up her right to trial by participating in mediation. Mediation was scheduled for March 1998. That mediation never went forward.

In August 1998, the court directed Ms. Voisenat to explain to her client that her good faith participation in mediation did not mean she had to "cave in" and that if the mediation failed, the trial would proceed. Ms. Voisenat testified that, prior to the mediation, she explained the process to plaintiff. In fact, she stated that she has explained the mediation process to plaintiff on at least two occasions, referring to the prior scheduled mediation.

### B. *Was Ms. Olam unduly pressured to sign the MOU?*

There is an additional, independently sufficient basis for the court's decision to grant defendants' Motion to Enforce the Settlement.

Plaintiff has failed completely to satisfy the second, essential element of the test for undue influence: she has not proved that she was subjected by anyone to "undue pressure."

In the factual setting before us, there are three *theoretically* possible sources of undue pressure: defendants and/or their counsel, the mediator, and plaintiff's attorney—Phyllis Voisenat.

#### 1. *Mr. Herman*

Plaintiff has never contended that Mr. Herman was the source of undue pressure. Nor is it clear that relief under California Civil Code §§ 1689(b)(1) and 1575 would be appropriate even if a party proved that a mediator had subjected her to undue pressure.

#### 2. *Ms. Voisenat*

Plaintiff vaguely intimated at some point that her own lawyer at the time, Ms. Voisenat, somehow pushed or "urged" her to settle. The court rejects any attempt to expand California Civil Code §§ 1689(b)(1) and 1575 to include as a source of "undue influence" the complaining party's own lawyer. Plaintiff has set forth no law that would support extension of the doctrine of undue influence in this respect. Expanding the doctrine in this way would encourage clients and counsel to manufacture bases for trying to avoid commitments otherwise fully enforceable. The law offers alternative avenues of recourse to clients who are in fact abused by their own lawyers.

Ms. Voisenat is an officer of the court. The court has no credible reason to believe that she did not do as she was directed. Ms. Voisenat later notified the court that plaintiff would agree to mediation on several specific conditions. One of these conditions was that any mediation communications would not be admissible at trial. *See,* Plaintiff's Memorandum . . . , filed August 24, 1998.

We hasten to add that the evidence in the record falls woefully short of supporting a finding that Ms. Voisenat pressured Ms. Olam to do anything. According to Ms. Olam, she had very little contact with Ms. Voisenat all day. Surely a half nod from a lawyer (as Ms. Olam says she saw from Ms. Voisenat just before signing the MOU) cannot constitute undue pressure. From all the evidence, we find that Ms. Voisenat was the secondary player in these negotiations, which were in fact dominated by her client. There is absolutely no basis for a finding that any action by Ms. Voisenat remotely overbore plaintiff's will.

#### 3. *Defendants and Their Counsel*

Similarly, there is no evidence that could support a finding that the defendants or their lawyer put any pressure on Ms. Olam during the mediation. As the plaintiff herself testified, there was essentially no interaction and no communication between her and defendants (or their lawyer) during the mediation.

Plaintiff emphasized that at the end of the session (roughly 12:00–1:00 a.m.), when she signed the MOU, the participants were "hurried" and that she perceived this hustle as pressure to sign the paper placed before her.

Mr. Herman agreed that at the end of the session "there was an atmosphere in both rooms to get moving." He also acknowledged that this atmosphere is "less than the ideal way to sign documents." But he insisted that no one urged plaintiff to "hurry up," that she appeared to read the MOU, that he waited until she indicated that she was ready to sign the MOU before he went to retrieve the copy that the defendants had signed (so all signatures would be on the same document).

In sum, there is no evidence that plaintiff was subjected to anything remotely close to undue pressure.[67]

For all of these reasons, the court finds that Ms. Olam understood the mediation process, her role in it, and its voluntary character.

67. In argument, plaintiff contended that at least four of the factors identified by California courts as indicia of undue persuasion

## CONCLUSION

Because plaintiff has failed to prove either of the necessary elements of undue influence, and because she has established no other grounds to escape the contract, she signed on September 10, 1998, the court GRANTS defendants' Motion to Enforce the settlement contract that is memorialized in the MOU.

Mr. Herman's August 23, 1999 testimony is UNSEALED.

**On Wednesday, October 13, 1999 at 4:00 p.m.,** the parties shall appear by telephone for a status conference—prepared to discuss the appropriate date by which Ms. Olam must vacate the Naples Property. Counsel for plaintiff must initiate the conference call and, with both parties on the line, must call the court at (510) 637-3326.

IT IS SO ORDERED.

---

were present on September 9–10, 1998: discussion of the transaction at an unusual or inappropriate time, consummation of the transaction in an unusual place, insistent demand that the business be finished at once, and extreme emphasis on the untoward consequences of delay. Plaintiff's Brief Concerning California Law Applicable to Purported Settlement Agreement, filed July 26, 1999.

The court FINDS as follows. Under the circumstances, the mediation was not conducted at an unusual or inappropriate time. The mediation began at 10:00 a.m. Although, atypically, it progressed into the early hours of the following day, each participant freely chose to continue settlement discussions. Plaintiff or any other participant could have ended the mediation at any time. This is not a case in which defendants came over to plaintiff's house at midnight urging her to settle.

Neither was the settlement consummated in an unusual place. The entire mediation, including signing the MOU, occurred in a courtroom of the United States District Court for the Northern District of California. The federal courtroom is a neutral administrative backdrop for such negotiations, and, if the atmosphere suggests anything, it reinforces the participants' notion of their right to proceed to trial to resolve their claims.

Plaintiff has established no evidence that there was an "insistent demand that the business be finished at once." Although the participants were "hurried" at 1:00 a.m., when signing the MOU, they had been there *all* day negotiating the terms. Moreover, as Mr. Herman testified these terms were established several hours before signing—that is, before the hurried exodus of which plaintiff testified.

Finally, plaintiff testified that Mr. Herman and Ms. Voisenat accepted the potential for losing both Ms. Olam's homes if she proceeded to trial. The court credits Mr. Herman's and Ms. Voisenat's testimony pursuant to which the court FINDS that each of them explained to plaintiff the strengths and weaknesses of her case and the potential outcomes. The court also FINDS that the decision to accept somewhat onerous terms rather than risking the loss of everything cannot be the basis for a claim of undue influence under California law.

The court also notes that plaintiff had independent counsel present throughout the mediation as well as an independent neutral affiliated with the court.